MOISE, Justice.
 

 This is a concursus proceeding in which the Delta Refining Company deposited certain sums of money in the Registry of the Nineteenth Judicial District Court for the Parish of East Baton Rouge, which sums represented the value of oil, less severance taxes, produced from a well known as A. J, Bankhead et al., Bank of Baton Rouge in Liquidation Well No. Two Unit, which well is located in the University Field of East Baton Rouge Parish, Louisiana.
 

 
 *425
 
 ■ The trial judge passed on many disputed claims, and from his judgment there are only two appeals. The first is by Mrs. Lillian B. Haase, individually and as tutrix of Charles Wendell Haase, Southern Production Company, Inc., William G. Helis, Jr., Testamentary Executor of the Succession of William G. Helis, deceased, and Maryland Casualty Company, from his judgment rejecting the claim of Mrs. Lillian B. Haase, individually and as natural tutrix of the minor, Charles Wendell Iriaase, to the ownership of the undivided one-half interest in and to the minerals under certain described property and the claim of Southern Production Company, Inc. and the Estate of William G. Helis to an oil, gas and mineral lease on the undivided one-half interest.
 

 Appeal Number Two is taken by the Bank of Baton Rouge in Liquidation from that part of the judgment awarding Robert Louis Kohlmann and William Kohlmann a %84th royalty interest of all the oil, gas and other minerals produced.
 

 The land involved is a part of Ben Hur Plantation located south of Baton Rouge, Louisiana, and is now an oil producing area known as the University Field. A chronological listing of title to the land involved in the present appeals is pertinent.
 

 On May 10, 1919, A. Adler Realty Company owned the Ben Hur Plantation which it sold to John P. and William H. Burgin, reserving to the vendor one-half of the minerals.
 

 On December 20, 1920, William H. Burgin sold his interest to John P. Burgin.
 

 On March 28, 1923, John P. Burgin conveyed the property to the Bank of Baton Rouge, subject to the reservation of one-half of the minerals made by A. Adler Realty Company in 1919.
 

 On December 27, 1924, the Bank of Baton Rouge conveyed the property to the Louisiana Investment Company.
 

 On December 28, 1925, the Louisiana Investment Company conveyed the property back to the Bank of Baton Rouge.
 

 By 1927, A. Adler Realty Company and the Bank of Baton Rouge had both entered into separate leases with Roxana Petroleum Corporation, and on July 28, 1927, they entered into the following understanding:
 

 “Whereas, it is to the mutual advantage of both lessors and lessee that lessors stipulate the extent of the interest of each in said property.
 

 “Now, therefore, lessors acknowledge that A. Adler Realty Company, a Louisiana corporation is the owner of an undivided one-half (%) interest in all minerals on and under said property, and that the Bank of Baton Rouge, a Louisiana corporation, is the owner of an undivided one-half (%) interest in all minerals on and under said property and
 
 the oivner of all of the surface of the land described in the aforementioned mineral lease.
 
 (Italics ours.)
 

 
 *427
 
 “And A. Adler Realty Company agrees that under the terms of the lease it executed it is entitled to one-half of the royalties, rentals and other monies therein provided.
 

 “And the Bank of Baton Rouge agrees that under the terms of the lease it executed it is entitled to one-half (V2) of the royalties, rentals and other monies therein provided.”
 

 We shall now discuss the effect of the above understanding. The reservation made by A. Adler Realty Company in the sale of Ben Hur Plantation to the Burgin brothers on May 10, 1919, if nothing were done which would prevent the prescription of that servitude, would prescribe on May 10, 1929; after that date, the Bank of Baton Rouge in Liquidation or the Louisiana Investment Company, being the owner of the surface land, would have become the sole owner of the minerals. On July 28, 1927, the date of the above understanding, the Bank of Baton Rouge in. Liquidation and the A. Adler Realty Company were each the owners of one-half of the minerals (because Adler’s reservation of minerals expired on May 10, 1929). This 1927 document should be accepted as proof of what it contains, and words must be given their normal meaning. It did no more than set forth, for the benefit of the mineral lessees, the ownership of the lessors at that time in the minerals. The current of prescription running had not completed its span, as shown, supra. The bare acknowledgment by a landowner of the existence of a mineral servitude in his lands does not interfere with the running of prescription. To have that effect the acknowledgment must be coupled with a purpose and intention, and such must be expressed in clear and unmistakable terms.
 

 In the case of Bremer v. North Central Texas Oil Co., 185 La. 917, 171 So. 75, 77, plaintiff granted a mineral servitude on June 30, 1924. On November 28, 1925, a three year oil and gas lease was executed. The contention was made that the lease interrupted the running of prescription. This Court held that there was no interruption and stated:
 

 “But article 3520 of the Code, which says that prescription ceases to run whenever the debtor or possessor ‘makes acknowledgment of the right of the person whose title they prescribed,’ does not mean that a mere acknowledgment of the existence of the rights of those in whose favor the servitude runs interrupts prescription. There must be more than a bare acknowledgment; the acknowledgment must be accompanied by or coupled with ‘the purpose and intention of the party making the acknowledgment to interrupt the prescription then running.’ ”
 

 The Court, in the Bremer case, supra, distinguished it from the case of Mulhern v. Hayne, 171 La. 1003, 132 So. 659, and stated:
 

 
 *429
 
 “On further consideration we adhere to our ruling in that case, but it has no .application to the case presently under consideration. Here the lease was •dated November 28, 1925, was for a ■period of only three years, and by its •terms expired on November 28, 1928, or more than five years prior to the end of the ten-year prescriptive period. There was, therefore, nothing in the lease to indicate that Bremer intended to interrupt prescription.”
 

 In the case of Achee v. Caillouet, 197 La. 313, 1 So.2d 530, 536, this Court stated:
 

 “ * * * It is utterly inconsistent and irreconcilable with the firmly established rule that a bare acknowledgment by the landowner of the existence of the mineral rights of another in his land does not interrupt the running of prescription in the sense that the prescription begins to run anew from the date of acknowledgment. To have that effect, the acknowledgment must be coupled with the purpose and intention that it shall have that effect, and such purpose and intention must be expressed in unmistakable terms. Frost Lumber Industries v. Union Power Co., 182 La. 439, 162 So. 37, and the cases therein cited; Bremer v. North Central Texas Oil Co., supra; Goldsmith v. McCoy, 190 La. 320, 182 So. 519; Vincent v. Bullock, 192 La. 1, 187 So. 35; Daggett on Mineral Rights in Louisiana, Section 14, pp. 38-52; Hightower v. Maritzky [194 La. 998, 195 So. 518].”
 

 In the case of Arkansas Louisiana Gas Co. v. Thompson, 222 La. 868, 64 So.2d 202, 210, we made the following pertinent statement :
 

 “One of the express requirements of the LSA-Civil Code is that the acknowledgment must be of the right of the person whose title the debtor or possessor prescribes. Article 3520. Not only must 'such acknowledgment be specific, clear and concise, La Del Oil Properties v. Magnolia Petroleum Co., 169 La. 1137, 126 So. 684; Frost Lumber Industries v. Union Power Co., 182 La. 439, 162 So. 37; Kennedy v. Pelican Well Tool & Supply Co., 188 La. 811, 178 So. 359; Daggett on Louisiana Mineral Rights, Revised Ed., pp. 83-85, but the instrument must adequately decribe the property to which it applies, James v. Noble, 214 La. 196, 36 So.2d 722, and must sufficiently identify the servitude as to which acknowledgment is sought to be made. Achee v. Caillouet, on Rehearing, 197 La. at page 332, 1 So.2d 530. Although mineral claimants may have in mind extending their mineral rights, they are powerless to do this without the consent of the landowners. White v. Hodges, 201 La. 1, 14, 9 So.2d 433.” See Haynes v. King, 219 La. 160, 52 So.2d 531.
 

 
 *431
 
 The trial judge made the following statement with respect to the 1927 agreement, which speaks for itself:
 

 “The stipulation of July 28, 1927 is very brief, and there is not the slightest suggestion in it that the parties intended to extend longer life to the Adler Company reservation made on May 10, 1919. It is nothing more than a division order to insure the proper payment of royalties in event of production by the lessee. I, therefore, hold that the mineral reservation and all rights to mineral interest of the A. Adler Company expired by the liberative prescription on May 10, 1929. Achee v. Caillouet, 197 La. 313, 1 So.2d 530; Goree v. Sanders, 203 La. 859, 14 So.2d 744; Mrs. Daggett’s Louisiana Mineral Rights, page 78.”
 

 It is well settled by our jurisprudence that a mineral servitude, having once become extinct by prescription, is a dead thing. It cannot be resurrected, and it can only be recreated by a new servitude. Haynes v. King, 219 La. 160, 52 So.2d 531. We hold it elementary that an extinguished servitude can only be resurrected by title. LSA-Civil Code, Articles 783, subd. 2, 789, 3546.
 

 Reverting to our chronological listing:
 

 On December 29, 1928, the Bank of Baton Rouge again transferred the property to the Louisiana Investment Company, and on February 23, 1937, the Louisiana Investment Company reconveyed the properties back to the Bank of Baton Rouge, including in this reconveyance all servitudes and rights of every kind and nature owned by the Investment Company.
 

 On February 3, 1939, A. Adler Realty Company executed a quitclaim in favor of the Bank of Baton Rouge in Liquidation.
 

 On July 31, 1933 the Louisiana Investment Company and A. Adler Realty Company entered into an agreement, which reads as follows:
 

 “Whereas the Louisiana Investment Company, Inc., hereinafter sometimes referred to as the Investment Company, did on June 22, 1932, enter into a lease with Karl E. Young, covering the oil, gas and mineral rights in, on and under the plantation commonly known as Ben Hur Plantation in the Parish of East Baton Rouge, Louisiana, less and excepting one hundred fifty-five (155) acres, which said lease is a community lease in which the Union Securities Company, Inc. joined, and
 

 “Whereas the said Investment Company entered into another community lease with the said Karl E. Young, covering the remaining one hundred fifty-five (155) acres, and
 

 “Whereas the A. Adler Realty Company, hereinafter sometimes referred to as the Realty Company, did enter into an oil, gas and mineral lease with
 
 *433
 
 the said Karl E. Young, covering an undivided one-half interest in and to the oil, gas and minerals in, on and under the said Ben Hur Plantation, which said lease is dated June 16th, 1933, and
 

 “Whereas the said Investment Company claims to be the owner of all oil, gas and minerals in, on and under the said plantation and the said Realty Company claims to be the owner of an undivided one-half interest in and to the oil, gas and minerals, in, on and under the said plantation, and
 

 “Whereas the said Investment Company is willing to admit the ownership until July 28th, 1937, by the Realty Company of such undivided one-half interest, subject to the provisions hereinafter set forth in Paragraph 2, and
 

 “Whereas under the agreements with the said Karl E. Young all royalties that might accrue from the said undivided one-half interest are to be placed in escrow in the Hibernia National Bank., pending a settlement of the controversy between the parties hereto, and
 

 “Whereas the said parties believe that it is to the best interests of both that definite proportions be fixed in so far as the said leases are concerned,
 

 “Now, Therefore, it is agreed as follows:
 

 “1. The Investment Company hereby recognizes the rights on the part of the Realty Company to an undivided one-half interest to the oil, gas or minerals in, on and under the said Ben Hur Plantation until July 28th, 1937.
 

 “2. But said Investment Company does not, by the fact of the execution of this document, acknowledge or recognize any rights in said Realty Company beyond July 28th, 1937; said Realty Company agreeing however that the execution of this document does not extend its rights beyond July 28th, 1937, but reserving all rights it may have irrespective of this document.
 

 “3. It is hereby agreed and understood that should oil, gas or minerals be produced on the said Ben Hur Plantation during the existence of the present leases between the parties hereto and Karl E. Young, covering Ben Hur Plantation, (special provision being hereinafter made for the 1SS acres placed in the second community lease and said 1SS acres-being excepted herefrom), the Realty Company shall be entitled to three-eighths (%) of the royalties due by the said Karl E. Young, and the Investment Company shall be entitled to five-eighths (%) thereof. Nothing herein contained, however, shall be interpreted as a modification of the terms of the community lease as between the Investment Company and its co-lessors.
 

 
 *435
 
 “4. With regard to the 155 acres placed in the second community lease, it is agreed that if any royalties should become due, from any oil, gas or minerals produced under said community lease the Realty Company shall receive % of 32.03% thereof and the Investment Company shall receive % of 32.03'% thereof.
 

 “5. It is distinctly understood that the provisions herein contained shall apply during the duration of the present leases with Karl E. Young or any renewals or extensions thereof or until July 28, 1937, if said lease or renewals or extensions shall have become null and void before July 28th, 1937.
 

 “6. It is further understood and agreed that should either party desire to do so, it may exercise such legal rights as it possesses to establish the extent of its ownership of the mineral rights, but that, regardless of the decision of the court with respect thereto, the method of dividing the royalties shall continue as hereinabove set forth in so far as any production under the present leases or any renewals or extensions thereof is concerned;
 

 “A copy of this agreement shall be furnished to Karl E. Young, who is authorized to pay the royalties that may become due in accordance with the terms hereof.
 

 “In Testimony Whereof the said Louisiana Investment Co., Inc., has signed these presents at Baton Rouge, Louisiana, on the 12th day of July,. 1933, through Eugene Cazedessus, its-president, acting under and by virtue of a resolution of the Board of Directors thereof, a certified copy of which», is hereto attached and made part hereof, and the said A. Adler Realty Company has signed these presents at New Orleans, Louisiana, on the 31st day of July, 1933, through Julius Adler, its-duly authorized president, acting under and by virtue of a resolution of the-Board of Directors thereof, a certified copy of which is hereto attached1 and made part hereof, this contract being executed in triplicate originals.”
 

 On January 12, 1934, the Louisiana Investment Company sold to James O. Haase,,, now deceased and survived by his .wife, Mrs. Lillian B. Haase, and his minor child,. Charles Wendell Haase, appellants, 30 acres; of Ben Hur Plantation.
 
 The act of sale-reserved all oil, gas and mineral rights in-, and to the property to the vendor.
 
 ,
 

 It is the contention of the Haaseappellants that the agreement which was; entered into between the Louisiana Investment Company and A. Adler Realty Company in the month of July, 1933, was an act. of compromise, whereby, the A. Adler Realty Company was recognized as the owner of an undivided one-half interest in and’ to the minerals underlying Ben Hur Plant
 
 *437
 
 .ation until July 28, 1937, and when this ■one-half interest in the minerals terminated ■on July 28, 1937, the same inured to J. O. 'Haase, the then owner of the 30 acre tract.
 

 There is no merit in this argument, be•cause at the time the 1933 agreement was ■entered into
 
 A. Adler Realty Company's ■.mineral servitude had been prescribed for ■.nearly five years.
 
 The parties could not 'have intended to create a
 
 new servitude,
 
 'because that could only have been
 
 done by .title
 
 — which is not so here. The agreement was only dealing with a division of royalties. .It did not renounce an accrued prescription ■or resurrect from the dead the servitude which expired in 1929. When the Louisiana Investment Company, Inc., in its sale ■of 30 acres to J. O. Haase, reserved all of ■the oil, gas and mineral rights, such reservation was effective as to the whole of the ¡servitude. In 1937, there was nothing to revert to Haase. Union Sulphur Co. v. Lognion, 212 La. 632, 33 So.2d 178.
 

 The trial judge held that the mineral interests of the A. Adler Realty Company ‘had been dead for over four years in 1933 .and that the agreement was not a compromise, because it acknowledged in the A. .Adler Realty Company everything the A. .Adler Realty Company claimed to own. He .also stressed the fact that there was no consideration. We adopt the following finding ■of the trial judge with respect to the 1933 .agreement:
 

 “At best the agreement of 1933 was .an authorization to the lease holder to pay a certain amount of money to the parties, which money under the terms of the agreement was in the nature of royalties and rentals and the monies
 
 were not to be paid for the creation of a servitude.
 
 The agreement specifically provides that ‘a copy of this agreement shall be furnished Carl E. Young who is authorized
 
 to pay the royalties that may become due in accordance with the terms hereof.’
 
 If the agreement could be construed as granting to the Adler Company a royalty interest that would not revive or create a new servitude in the Adler Company and the Louisiana Investment Company and its assigns would continue to own the whole servitude. St. Martin Land Co. v. Pinckney, 212 La. 605, 33 So.2d 169; Vincent v. Bullock, 192 La. 1, 187 So. 35.”
 

 “If that agreement did create or grant a royalty interest in Adler Company it was only a conditional obligation effective in event of production and
 
 this obligation lapsed on July 28, 1937. Not being a servitude, no production having been realized, there was nothing to revert to the land owner and the Louisiana Investment Company and its assigns continued to be the sole owners of the zvhole mineral servitude.
 
 Union Sulphur Co. v. Lognion, 212 La. 632, 33 So.2d 178.” (Italics ours.)
 

 Since we have determined that the agreement of 1927 did not interrupt prescription,
 
 *439
 
 it follows that the agreement of 193.3 could not, as said by the trial judge, revive something that was dead.
 

 “ * * The language of the cases indicates that a mineral servitude cannot be revived after it is extinguished by prescription. Porter-Wadley Lumber Co. v. Bailey [5 Cir., 1940, 110 F.2d 974]; English v. Blackman [189 La. 255, 179 So. 306]; Cox v. Acme Land & Investment Co., 192 La. 688, 188 So. 742; Deas v. Lane, 202 La. 933, 13 So.2d 270; Wall v. United Gas Public Service Co., La.App., 181 So. 562, 567.’ 23 Tul.L.Rev. 413.” Haynes v. King, supra [219 La. 160, 52 So.2d 539.]
 

 “The courts have on occasions referred to an extinguished servitude as being a dead thing or, in other words, no longer in existence. * * * This Court has also pointed out that a servitude can only be established by
 
 acts such as are used in the transfer of title to immovable property.
 
 LSA-Civil Code, Articles 743, 766, 770; Long-Bell Petroleum Co. v. Tritico, on rehearing, 216 La. 426, 43 So.2d 782. Since the servitude in this case has become extinct, it cannot be re-created or
 
 established anew except by
 
 title« * * * ” Wise v. Watkins, 222 La. 493, 62 So.2d 653, 656. (Italics ours.)
 

 We do not think that the agreement of 1933, by reserving to the Realty Company the right to judicially assert any claim it might have, was an admission of ownership in the Adler Realty Company. One might always assert a claim, and it is-for the courts to determine whether there is a cause of action. By the quitclaim deed of 1939, A. Adler Realty Company decided not to engage in further litigation.
 

 The record reflects drilling by lessees of Bank in 1939 and 1940. On March 12, 1949, a producing well, known as A. J. Bankhead et al., Bank of Baton Rouge in Liquidation, Well No. 2, was brought in on the Haase 30 acre tract. Therefore, at no time has-there been a lapse of ten years after the Haase purchase.
 

 On the question of estoppel, the trial judge made the following pronouncement r
 

 “While it may not be necessary to pass on it in view of my ruling on the merits pertaining to the 30 acre tract, I think the alternative plea of estoppel filed by the Bank of Baton Rouge is good. A. J. Bankhead, Progress Petroleum Co., Inc., Clint L. Pierson and the First National Bank of Houston, also filed pleas of estoppel to any claim on the 30 acre tract made by the Haase Estate, or any claim of William G. Helis, Jr., Testamentary Executor of the Succession of William Helis, deceased, or any claim of the Southern Production Company, successor toDanciger Oil and Refining Company, on the ground that in granting the lease on this 30 acres that brought in the well to A. J. Bankhead, the Bank of Baton Rouge, Bankhead and the others filing-
 
 this plea of
 
 estoppel,
 
 relied on the-
 
 
 *441
 

 actions of fames 0. Haase in executing at least 6 leases and pooling agreements which recognised and acknozvledged that the Bank of Baton Rouge and its assigns ozvned the zvhole of the minerals in this 30 acres. The plea of estoppel filed by the Bank of Baton Rouge is also based on the same leases and contracts.
 
 Counsel for the Haase interests argues that Bankhead and his assigns are not privies to the acts which are set up as constituting the basis for the plea of estoppel and, therefore, cannot urge estoppel. On the authority of McDonald v. Richard, 203 La. 155, 13 So.2d 712, this contention is correct and the plea filed by A. J. Bankhead and his assigns will be overruled. However,
 
 the Bank of Baton Rouge was a party to the several acts referred to in which Haase acknowledged the Bank of Baton Rouge as the ozvner of all the minerals in that 30 acres and the Bank is the party which made the lease to Bcwikhead, relying on the acknowledgments of Haase and that lease brought in the well.
 
 There are certain thinly veiled distinctions classifying the different characters of estoppel. My understanding of the estoppel herein invoked is that the Haase Estate and those claiming from it should not be permitted to deny the truth of the fact stipulated in the instrument referred to where the Bank of Baton Rouge was acknowledged as the owner of the whole mineral rights in the 30 acres and that
 
 this is a form of estoppel by deed.
 
 There is no attempt here to create a title to an immovable by this plea. The Bank already had title to the full interests, when the acknowledgments were made. The plea of estoppel, filed herein by the Bank for these reasons is hereby maintained. Mims v. Sample, 191 La. 677, 186 So. 66; Gary v. Bullock, 206 La. 231, 19 So.2d 120.” (Italics ours.)
 

 James O. Haase is the deceased husband of Mi's. Lillian B. Haase, and father of the minor. He was the head and master of the community. Our learned brother below found that Haase, in executing at least six leases and pooling agreements, recognized and acknowledged that the Bank of Baton Rouge and its assigns owned the whole of the minerals in this 30 acres, and the Bank is the party which made the lease to Bankhead, relying on the acknowledgment of Haase, and that lease brought in that well. We are not disposed to give to his widow a letter of credit to repudiate the acknowledgment of her husband solemnly made by authentic act. We agree with the findings of the District Court.
 

 We shall now discuss the Kohlmann claim.
 

 On April 13, 1937, A. Adler Realty Company, three months before its rights under the 1933 agreement would expire, sold to-Leon L. Kohlmann an undivided
 
 Vieth
 
 interest in and to all of the oil, gas and other minerals in and under, or that may be
 
 *443
 
 produced from a certain portion of Ben Hur Plantation. Leon L. Kohlmann and his ■wife, Janice Kahn, then donated this interest to their minor children, Robert Louis and William Kohlmann, on the same day, April 13, 1937. The donation was accepted by Leon L. Kohlmann for and on behalf of the two minor children.
 

 On February 6, 1939, Leon Kohlmann ■quitclaimed to the Bank of Baton Rouge the above recited interest and accepted in return for his minor children an undivided one-forty-eighth (listh) of the royalty, that is, ■one-forty-eighth (14sth) of the usual base royalty of one-eighth (%th), or one-three hundred eighty-fourth (%84th) part of all the oil, gas, or other minerals of whatever kind that may be produced from certain described portions of Ben Hur Plantation.
 

 The Bank of Baton Rouge plead prescription against the claim of the Kohlmann boys. The trial judge overruled the plea and ruled ■that the royalty interest would be enforced.
 

 The Bank of Baton Rouge argues that the ■sole question presented by the plea of prescription is whether under the compromise the title to the royalty vested in the minors, ■or vested in the father. It contends that the above donation was a simulation, and that title was really in the father and his interest has prescribed. If title vested in the minors, prescription has not accrued.
 

 At the time the Bank of Baton Rouge entered into the compromise with the Kohlmann boys, through their father, it had disposed of parts of Ben Hur Plantation. The interest of the Kohlmann boys was a threat of pending litigation. In order to avoid future litigation and clear certain titles, it entered into the compromise agreement.
 

 Article 3071 of the Revised Civil Code recites :
 

 “A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
 

 “This contract must be reduced into writing.”
 

 Article 3078 further states:
 

 “Transactions have, between the interested parties, a force equal to the authority of things adjudged. They can not be attacked on account of any error in law or any lesion. But an error in calculation may always be corrected.” See, Sellwood v. Phillips, 185 La. 1045, 171 So. 440; Stoufflet v. Duplantis, 208 La. 186, 23 So.2d 41.
 

 We think that the Bank of Baton Rouge is bound by the agreement into which it entered with the Kohlmann boys, through their father, and since prescription has not accrued so far as the minors are concerned, they are entitled to their royalty interests. On a claim of simulation, probability, conjecture or suspicion is not sufficient
 
 to
 
 glorify a litigant with a judgment, but it
 
 *445
 
 must be by proof with a reasonable certainty.
 

 For the reasons assigned, the judgment of the trial court rejecting the claim of Mrs. Lillian B. Haase, individually and as tutrix of Charles Wendell Haase, Southern Production Company, Inc., William G. Helis, Jr., Testamentary Executor of the Succession of William G. Helis, and Maryland Casualty Company is affirmed; and the judgment awarding Robert Louis Kohlmann and William Kohlmann a %84th royalty of all the oil, gas and other minerals produced or saved from certain described lands is, likewise, affirmed.
 

 HAMITER, J., dissents as to mineral interest claimed by Mrs. Haase, otherwise he concurs.