170 So.2d 347

Mrs. Cortez Burns ARMOUR et al.

v.

R. O. SMITH et al.

No. 47047.

Dec. 14, 1964.

Dissenting Opinion Dec. 23, 1964.

Stewart & Stewart, Dan W. Stewart, III, Minden, for plaintiff-applicant.

H. M. Holder, Tucker, Martin, Holder, Jeter & Jackson, Shreveport, for defendants-respondents.

FOURNET, Chief Justice.

This proceeding was instituted by the plaintiff, Mrs. Cortez Burns Armour, in which she was joined by her husband, Olon G. Armour, as owner of the Northwest Quarter of Northwest Quarter (NW¼ of NW¼) of Section Sixteen (16), Township Twenty-three (23), North, Range Nine (9) West, Webster Parish, Louisiana, to have decree prescribed because of nonusage for a period extending beyond ten years

certain mineral rights affecting her property in favor of R. O. Smith and J. I. Roberts, defendants herein, and to have same cancelled from the records of Webster Parish; and is now before us on a writ of certiorari granted on the application of the plaintiff to review the judgment of the Court of Appeal, Second Circuit, reversing the judgment of the district court in her favor. See, La.App., 158 So.2d 446.

The facts are not in dispute and according to the stipulation of counsel, plaintiff acquired the above described property by deed dated December 6, 1939, from Andrew C. Burns, in which he reserved all of the oil, gas and other minerals although in acquiring this same property by deed from Drew Burns dated December 18, 1936, vendor reserved unto himself a one-fourth interest of the minerals.[1] By instrument dated May 29, 1946, plaintiff, her husband, Andrew C. Burns and his wife, as lessors, executed an oil, gas and other mineral lease in favor of Hunt Oil Company using a printed Bath-Gram form. The lease was for a primary term of ten years, and as long thereafter as there was production of oil, gas and other minerals; it contained the usual annual renewal clause with the specific typewritten agreement: "* * * among lessors that all the delay rentals payable under this lease if paid,

1. This mineral servitude prescribed on December 18, 1946, a few months after the execution of the lease in favor of Hunt Oil Company.

are to be paid to Cortez Burns Armour; *It is further agreed between and among lessors that 50% of the royalty, if produc-tion occurs, is to be paid to Cortez Burns Armour and 50% of the royalty is to be paid to Andrew C. Burns."* Andrew C. Burns sold a one-fourth interest in all the minerals in and under this property to R. O. Smith by deed dated March 1, 1948, with the understanding: *" \* \* \* between the parties hereto that this sale is made sub-ject to any valid and duly recorded oil and gas lease, but covers and includes one fourth (1/4) of all the oil royalties and gas rentals or royalties due and to become due under the terms of any such lease."* Smith, in turn, on September 3, 1948, conveyed by deed an undivided one-eighth interest in the minerals to J. I. Roberts, which con-tained a similar provision. (Emphasis ours)

On April 8, 1948, plaintiff, her husband, her vendor Burns and his wife joined in an instrument declaring that in the deed of December 6, 1939, by which she had ac-quired the property, an error was committed in that Burns reserved unto himself all of the mineral rights, and in order to cor-rect this error, they (the Burns) specifical-ly conveyed an undivided one-half inter-est in and to all oil, gas and other minerals to the plaintiff with the further stipulation: *" \* \* \* this deed of correction is and shall be effective from the date of this deed so that \* \* \* Andrew C. Burns and Mrs.*

*Florence M. Newsome Burns shall be the owners of the minerals jointly with her (plaintiff),* subject to prior mineral sales." (Emphasis and brackets ours)

These same parties, i.e., Mr. and Mrs. Burns and Mr. and Mrs. Armour, in an in-strument dated March 20, 1953, acknowl-edged the deed whereby plaintiff had ac-quired the property on December 6, 1939, and its modification or correction by the instrument of April 8, 1948, observing: "Whereas, some question has been raised as to whether or not prescription was in-terrupted on the one-half (1/2) interest in the oil, gas and other minerals so re-served, by the execution of the act of cor-rection dated April 8, 1948;" and in re-solving the matter stated: " \* \* \* in or-der to remove any doubt as to the effect of the instrument dated April 8, 1948, of record \* \* \* *SECOND PARTIES HERE-TO (the landowners, the Armours) do hereby expressly acknowledge and declare that it was the intention of all parties to said instrument to interrupt the running of the liberative prescription on the mineral servitude resulting from the reservation of one-half (1/2) of the oil, gas and other minerals by FIRST PARTIES (the Burns) in the above mentioned deed, the said inter-ruption to be effective as of April 8, 1948."* (Emphasis and brackets ours)

The original lease executed on May 29, 1946, was amended (by instruments dated

January 23, 1951, March 20, 1951, September 20, 1954 and February 18, 1955) whereby the lessee, Hunt Oil Company, was joined by the plaintiffs, Mr. and Mrs. Armour, the defendants Smith and Roberts and Andrew C. Burns, as LESSOR, authorizing the LESSEE to " * * * pool, combine, and unitize the lands covered thereby, * * *" with any other land or lease of land adjacent thereto " * * * so as to create by such combination one or more operating unit or units * * *" not to exceed 160 acres each, and wherein it was specifically provided: " * * * In lieu of the royalties, overriding royalties or other production payments provided for in the above mentioned lease, or other contract to which they are parties, *each of the parties constituting LESSOR shall receive on the production from any unit formed hereunder only such proportion of such royalties, overriding royalties or other production payments as the amount of the acreage to which such royalties, overriding royalties or other production payments pertain and which is placed in the unit bears to the total acreage so pooled in the particular unit involved. * * *"* The lease, as amended, also contained the statement that: "The

foregoing provisions shall have the same effect as though they had been incorporated in said lease at the time it was originally written and executed," which was on May 29, 1946. (Emphasis ours)

The discovery of oil led to production on February 1, 1955, and on February 18, 1955, in conformity with the contract of lease, as amended, Hunt Oil Company joined with Carter Oil Company in forming a unit for the production thereof.

From the foregoing, it is obvious the lease granted by plaintiff and Andrew C. Burns to the Hunt Oil Company is a joint lease under the well established jurisprudence of this state on this subject,[2] extending as it does for a period more than six years beyond the time when the servitude of Andrew C. Burns would have prescribed, with the stipulation that in the event of production, plaintiff, Mrs. Armour, and Andrew C. Burns are each to receive 50% of the royalty. It is clear that on May 29, 1946, plaintiff landowner could not grant a valid mineral lease as title to all the mineral rights under the property was outstanding, hence in order to derive the advantages under the terms of the lease, i.e., the delay rentals during the primary term thereof,

2. Frost Lumber Industries v. Union Power Co., 182 La. 439, 162 So. 37; Vincent v. Bullock, 192 La. 1, 187 So. 35; Spears v. Nesbitt, 197 La. 931, 2 So.2d 650; White v. Hodges, 201 La. 1, 9 So.2d 433; Deas v. Lane, 202 La. 933, 13 So.2d 270; Baker v. Wilder, 204 La. 759, 16 So.2d 346; Farrell v. Simms, 209 La. 1072, 26 So.2d 143; Adam v. Johnson, La.App., 133 So.2d 175 (cert. den.); Union Oil Company of California v. Touchet, 229 La. 316, 86 So.2d 50; Namie v. Namie, La.App., 134 So.2d 572 (cert. den.); see also, cases cited under footnote three.

and, in the event of production, to share in the royalties, 50% to each, it was necessary that she be joined in the contract by Andrew C. Burns and consent that his servitude be extended beyond the date when it would have prescribed (December 6, 1949) in order that the lease might have legal effect during its primary term.[3] Having thus joined with Burns in this contract of lease in consideration of the advantages to be derived for their common benefit, the contract is joint and indivisible and binding on all parties thereto.

It necessarily follows that inasmuch as the payment of royalties had been expressly fixed by the contract of May 29, 1946, Smith's acquisition from Andrew C. Burns being subject to said lease, he thereby succeeded his vendor in the enjoyment of the benefits thereunder to the extent of his acquisition, as did Roberts, to whom Smith later transferred one-half of his interest.

The construction and interpretation placed by the parties themselves on the contract of lease by their subsequent acts unquestionably demonstrate, as we concluded, their intention to enter into a joint contract for their common benefit. As shown hereinabove, the Armours and the Burns not only

executed the correction deed on April 8, 1948, which recites: " * * * this deed of correction is and shall be effective from the date of this deed so that * * * Andrew C. Burns and Mrs. Florence M. Newsome Burns shall be the owners of the minerals jointly with her (plaintiff), subject to prior mineral sales," and the instrument of March 20, 1953, wherein it is specifically stated the above agreement had been entered into with the definite purpose of interrupting the then running of prescription against the Andrew C. Burns servitude as of that date, April 8, 1948; but also, they voluntarily joined the lessee Hunt Oil Company and the defendant mineral holders in amending the lease, whereby the mineral interests of the various parties were pooled and unitized so as to authorize the lessee to form units to secure production—each to participate in the royalties according to his respective ownership of acreage in proportion to the total acreage so pooled in the particular unit involved. (Brackets ours)

A perusal of the authorities relied on by plaintiff in her contention that the contract was not a joint lease and the defendants' servitudes had prescribed readily discloses they are inapposite from both a factual and

---

3. Mulhern v. Hayne, 171 La. 1003, 132 So. 659; Bremer v. North Central Texas Oil Co., 185 La. 917, 171 So. 75; Kennedy v. Pelican Well Tool & Supply Co., 188 La. 811, 178 So. 359; English v. Blackman, 189 La. 255, 179 So. 306; Goldsmith v. McCoy, 190 La. 320, 182 So. 519; Hightower v. Maritzky, 194 La. 998, 195 So. 518; Achee v. Caillouet, 197 La. 313, 1 So.2d 530; Robinson v. Horton, 197 La. 919, 2 So.2d 647; Arkansas Louisiana Gas Co. v. Thompson, 222 La. 868, 64 So.2d 202; Barnsdall Oil Co. v. Succession of Miller, 224 La. 216, 69 So. 2d 21; Elkins v. Roseberry, 233 La. 59, 96 So.2d 41.

legal standpoint, and are not pertinent to the case at bar; hence no useful purpose would be served by a discussion of them herein.

We therefore conclude the holding of the Court of Appeal: "* * * that the mineral rights of the defendants were contractually preserved during the period of the lease and were extended indefinitely by the beginning of production on February 1, 1955[.] * *" is correct.

For the reasons assigned, the judgment of the Court of Appeal, Second Circuit, is reinstated and made the final judgment of this court. All costs are taxed to the plaintiff.

SUMMERS, Justice (dissenting).

I am unable to subscribe to the results or the reasons assigned by the majority in its opinion. My appreciation of the facts and law is so much in conflict with the majority that, rather than attempt an analysis of that opinion, I have decided to record my views in juxtaposition to those of the majority.

In this suit the plaintiff landowner, Mrs. Cortez Burns Armour, joined by her husband, claims that the servitude resulting from a mineral reservation affecting her property in Webster Parish is prescribed by virtue of the liberative prescription of ten years.

The defendants, R. O. Smith and J. I. Roberts, who have deeds to a fraction of the minerals underlying plaintiff's lands, having acquired from the party in whose favor the reservation was made, contend that the liberative prescription of ten years invoked by plaintiff did not accrue because it was either interrupted or extended.[1] In support of this contention defendants maintain that, under a lease signed by the landowner and servitude owner from whom they acquired their mineral interests, production was obtained after the initial 10-year period of prescription, but during the prolonged period resulting from interruption or extension. This production, they assert, has the effect of user of the servitude preserving its life in their favor. Alternatively, defendants claim they have a contractual right to royalties. For these reasons they deny plaintiff's right to the cancellation she seeks.

The pleadings, stipulation of facts and pertinent documents relied upon by the parties form the record upon which the trial court rendered judgment ordering the cancellation of the mineral servitude.

The court of appeal, though failing to find any specific provision in the pertinent documents evidencing an intention on the

1. There is no question of suspension of liberative prescription presented by the contentions of the parties or the facts.

part of the plaintiff landowner to "suspend" or "interrupt" the running of the prescriptive period, observed that it appeared the "mineral rights" of the defendants were "contractually preserved". Upon this theory it was decreed that defendants were entitled to royalties from production, though occurring more than ten years following the mineral reservation. (See La.App., 158 So.2d 446.) Accordingly, the judgment of the trial court was reversed. We granted certiorari on the application of plaintiff landowner.

On December 18, 1936, Drew Burns sold the property in question to Andrew C. Burns, reserving one-fourth of the oil, gas and other minerals. Approximately three years later, on December 6, 1939, Andrew C. Burns conveyed the property to the plaintiff, Mrs. Cortez Burns Armour, reserving all of the oil, gas and other minerals. This reservation of the entirety of the minerals was in reality limited by law and the facts to a reservation of the three-fourths interest which Andrew C. Burns then owned. He could not reserve to himself the reversionary interest in the minerals then outstanding in Drew Burns. Liberty Farms v. Miller, 216 La. 1023, 45 So.2d 610 (1950); McDonald v. Richard, 203 La. 155, 13 So.2d 712 (1943). Thus, after the sale to Mrs. Armour, one-fourth of the minerals continued to be owned by Drew Burns and Andrew C. Burns owned the three-fourths interest he reserved in the sale to Mrs. Armour.

This was the division of ownership of the minerals when, on May 29, 1946, Andrew C. Burns and Mrs. Armour executed a mineral lease in favor of Hunt Oil Company, providing for a primary term of ten years. Thus the lease extended beyond the ten-year period of the undeveloped servitude then owned by Andrew C. Burns.

This lease consists of one document signed by Andrew C. Burns, Mrs. Armour and her husband, Olon G. Armour. It is an act under private signature dated May 29, 1946. The signatures of each of the parties were witnessed separately by K. O. Fletcher and Joseph J. Stephens. On May 30, 1946, the witness Stephens appeared before a notary in Claiborne Parish and executed an oath that he saw the parties sign. These circumstances shed no light upon whether the parties signed the lease at the same time or separately, a factor which this court has heretofore considered significant in the determination of whether a joint lease was intended. The stipulation is also silent on this subject.

The lease is on a printed commercial lease form. Its caption names "Andrew C. Burns, the husband (of) Florence Newsome, Cortez Burns Armour and Olon G. Armour her husband, * * * lessor (whether one or more)." These parties thereafter executed certain amendments to the lease

dealing with unitization, which have no real bearing on the issues of the case.

The lease contains this after-acquired-interest clause, which was typed onto the printed form:

"This lease covers not only such interest as lessor owns in the leased premises at the present time, but also such additional interest as Lessor may acquire in the future by operation of the law or otherwise. There shall be no increase of rentals in the event of the acquisition of such additional interest."

Obviously, the reason for the inclusion of this clause was the fact that at the time of the execution of the lease Mrs. Armour's property was burdened with outstanding mineral servitudes affecting the entirety of the minerals, and this clause was designed to cover those minerals (including the interest of Andrew C. Burns, Mrs. Armour's co-lessor) which, in the absence of interruption or extension, would necessarily revert to her during the life of the lease. Gayoso Co. v. Arkansas Natural Gas Corp., 176 La. 333, 145 So. 677 (1933); St. Landry Oil & Gas Co. v. Neal, 166 La. 799, 118 So. 24 (1928); Wolf v. Carter, 131 La. 667, 60 So. 52 (1912). At the time of its confection, therefore, the lease did not affect the entirety of the minerals. Only the existing interest of Andrew C. Burns was then affected, for the Drew Burns interest re-

mained outstanding because he did not sign as a lessor.

Following in a separate paragraph is this rental and royalty division clause which was typed onto the printed lease form:

"It is agreed between and among lessors that all the delay rentals payable under this lease, if paid, are to be paid to Cortez Burns Armour. It is further agreed between and among lessors that 50% of the royalty, if production occurs, is to be paid to Cortez Burns Armour and 50% of the royalty is to be paid to Andrew C. Burns."

The above stipulation between the parties concerning the division of royalties between them was subject to the royalty reduction clause in the warranty provisions of the lease which reads as follows:

"Lessor hereby warrants and agrees to defend the title to said land and agrees that lessee at its option may discharge any tax, mortgage or other lien upon said land and in event lessee does so, it shall be subrogated to such lien with the right to enforce same and apply rentals and royalties accruing hereunder toward satisfying same. Without impairment of lessee's rights under the warranty in event of failure of title, *it is agreed that if lessor owns an interest in said land less than the entire fee simple estate, then the royalties and rentals to be paid*

*lessor shall be reduced proportionate-ly."* (Emphasis added.)

The next significant date is December 18, 1946, for on that date the one-fourth mineral interest theretofore outstanding in Drew Burns reverted to Mrs. Cortez Burns Armour, the then owner of the land. So, on this date, Mrs. Armour owned one-fourth of the minerals and Andrew C. Burns owned three-fourths, and, under the after-acquired-interest clause of the lease, the lease then affected the entirety of the minerals underlying the lands.

Then, on March 1, 1948, Andrew C. Burns sold and conveyed to R. O. Smith, one of the defendants, one-fourth of the mineral rights in the subject property, the deed reciting that,

"It is understood between the parties hereto that this sale is made subject to any valid and duly recorded oil and gas lease, but covers and includes one-fourth (1/4) of all the oil royalties and gas rentals or royalties due and to become due under the terms of any such lease."

Following this sale the mineral ownership was then vested one-fourth in Mrs. Armour, one-fourth in Smith and one-half in Andrew C. Burns.

Apparently, being somewhat uncertain about the status of things at this stage, Mrs. Armour and Andrew C. Burns exe-cuted an agreement on April 8, 1948, purporting to be a correction of the original deed whereby Mrs. Armour acquired the property. That instrument recites:

"The appearers, Andrew C. Burns, and Mrs. Florence M. Newsome Burns now declare that in the above stated and referred to deed they reserved unto themselves their heirs and assigns all of the oil, gas and other minerals underlying and that might be produced from said property, but that this was in error, and that they have and do by these presents, to correct said error, convey, sell and deliver unto the said Mrs. Cortez Burns Armour an un-divided one-half interest in and to the oil, gas and other minerals under-lying and that might be produced from the said above described property.

"Now to these presents appeared Mrs. Cortez Burns Armour who de-clares that she has and does now by these presents accept the above and foregoing deed of correction with the understanding that all delay rentals to be paid under the present lease shall be paid to Andrew C. Burns, and Mrs. Florence M. Newsome Burns, and that this deed of correction is and shall be effective from the date of the execu-tion of this deed so that, in accord-ance with the law, the said Andrew C. Burns and Mrs. Florence M. New-

some Burns shall be the owners of the minerals jointly with her subject to prior mineral sales."

By the conveyance in this correction instrument Mrs. Armour became owner of three-fourths of the minerals, while Smith owned one-fourth. This result must follow for, as we pointed out above, prior to the correction deed the minerals were vested one-fourth in Mrs. Armour, one-fourth in Smith and one-half in Andrew C. Burns. Therefore, when, by the correction deed of April 8, 1948, Andrew C. Burns conveyed one-half of the minerals to Mrs. Armour he divested himself of all that he owned and her interest was thereby augmented so that she then owned three-fourths.

Hence, the effect of the declaration in the correction deed that Mrs. Armour and Andrew C. Burns were to own the minerals thereafter jointly "subject to prior mineral sales" was that Andrew C. Burns' joint ownership was subject to the prior mineral sale to Smith. Consequently, this amounted to a recognition that Smith and Mrs. Armour were to be joint owners of the minerals in the then-established proportions of three-fourths to Mrs. Armour and one-fourth to Smith—Smith being the assignee of the Andrew C. Burns' interest.

It should be observed in retrospect that under the terms of the reduction clause of the lease these lessors could not require the payment of all royalties to them as long as the mineral interest of Drew Burns remained outstanding. Therefore, the royalty division stipulation in the lease actually meant that, until the interest of Drew Burns reverted to the landowner, Mrs. Armour and Andrew C. Burns would each receive 50% of 75% of the royalties. Then, after the reversion of the Drew Burns interest to the landowner, it may be concluded that so long as the parties owned an interest in the lease by virtue of their mineral ownership each would receive 50% of the total royalties due from production by virtue of the division of royalty stipulation. The operation of the after-acquired-interest clause on the change of interest in this instance would be obvious and clear.

As already noted, Andrew C. Burns subsequently sold one-fourth of the minerals and one-fourth of the royalties to one R. O. Smith. By virtue of this conveyance Smith and his assigns would thereafter be entitled to one-fourth of the production, or one-half of Andrew C. Burns' 50% of the royalties. Thus, under the operation of the warranty and reduction of interest clause, and according to the terms of the mineral deed, Andrew C. Burns' interest in the lease and royalties accruing therefrom were proportionately reduced.

Later, when by the correction deed Andrew C. Burns sold his remaining one-half to Mrs. Armour thereby divesting himself of all of his interest, Mrs. Armour

would consequently acquire all of his interest in royalties due under the lease. For, having acquired the mineral interest which formed the foundation of Andrew C. Burns' interest in the lease, Mrs. Armour also acquired his entitlement to royalty under the lease. It could not be said, in view of the provisions in the lease, that he could divest himself of all of his mineral interest in the land and still retain rights under the lease. His sale of the fractional mineral interest carried with it a like proportion of his rights to royalties in the lease. For, if he conveyed to Mrs. Armour the mineral interest without a like proportion of the royalties to which he was entitled under the lease, he, in fact, conveyed nothing to her insofar as production is concerned.

On September 3, 1948, R. O. Smith sold and conveyed to the other defendant, J. I. Roberts, an undivided one-eighth interest, being half of the interest he had acquired from Andrew C. Burns on March 1, 1948. It is the interest of Smith and Roberts which plaintiff seeks to have declared prescribed and cancelled.

On December 6, 1949, the ten-year liberative prescription tolled on the servitude created by the mineral reservation in favor of Andrew C. Burns in the deed to plaintiff dated December 6, 1939, unless the running of prescription was interrupted or extended by user or acknowledgment.

There had been no drilling operations on the property at this time and the oil, gas and mineral lease was duly maintained in full force and effect according to the terms and provisions thereof by the proper and timely payment of delay rentals by the lessee. On October 18, 1954, during the primary term of the lease, but approximately fifteen years after the mineral reservation by Andrew C. Burns on December 6, 1939, a well was spudded in on a unit of which the lands in question formed a part resulting in the completion of a producing oil and gas well on February 1, 1955.

The primary issue presented by this tangled array of facts is whether the joinder of the parties in the lease on May 29, 1946, and the execution of the correction instrument of April 8, 1948, separately or collectively, constitute an interruption or extension of the prescription then running against the mineral servitude theretofore reserved by Andrew C. Burns in the deed to Mrs. Armour dated December 6, 1939. If an interruption or extension of the servitude did take place, the drilling of the well constituted a user during the extended period maintaining its life in favor of Smith and Roberts.

Or, in the alternative, if no interruption or extension took place, Mrs. Armour owned all the minerals at the time production occurred; and the issue, then, is whether the clause in the lease providing for the

division of royalties had the effect, as defendants allege, of "integrating the interest in and to the mineral rights which the lessors had, and/or thereafter acquired, in such manner that regardless of the ownership of the mineral rights, any royalty thereafter payable pursuant to said lease were to be paid pursuant to the contract between the parties and in the manner that the payment of royalty was stipulated for, as between the parties * * *"

Referring first to the primary issue, it is observed that recent pronouncements of this court unmistakably declare that it must clearly appear, either from the contract itself or from extraneous evidence submitted by the parties for the purpose of showing their intent, that the parties signing a lease intended to extend outstanding mineral interest during the term of the lease. Elkins v. Roseberry, 233 La. 59, 96 So.2d 41 (1957); Barnsdall Oil Co. v. Succession of Miller, 224 La. 216, 69 So.2d 21 (1953) and cases cited therein; 36 Tul. L.Rev. 872 (1962); 22 La.L.Rev. 867 (1962); 18 La.L.Rev. 55 (1958).

The latest expression of this court on the subject is contained in Elkins v. Roseberry, supra, wherein this court declared:

"The sole question presented in this case is whether or not the lease executed on March 18, 1946, by Elkins and Roseberry to the Phillips Petroleum Company is a joint lease.

* * * * * *

"The question presented here has been considered on many occasions by this Court and we have consistently held that it must clearly appear either from the contract itself or from extraneous evidence, submitted by the parties for the purpose of showing their intent, *that the parties signing a lease intended to extend outstanding mineral interests to the primary term of the lease. We have pointed out that the intention of the parties is the controlling factor,* a question of fact, to be determined by the terms of the lease or extraneous evidence. * * * *The mere signing of a lease such as the one under consideration is not sufficient to make it a joint lease in the absence of any showing that it was intended to be a joint lease."* (Emphasis added.)

It is a firmly entrenched principle in Louisiana mineral law that no act on the part of a landowner will have the effect of extending or interrupting the life of a mineral interest, unless it is shown that there was a clear intention on the part of the landowner to achieve that very result. Union Oil Company of California v. Touchet, 229 La. 316, 86 So.2d 50 (1956).

In this connection, I can find no basis for applying a different standard to an extension as distinguished from an interruption of a mineral servitude. Both, it appears to me, are based upon the recogni-

tion or acknowledgment of the outstanding mineral servitude and a clearly manifested intention to extend or interrupt the servitude, that is, prolong its life or have it begin to run anew.

The rule of law which forms the basis for the majority decision is based on the proposition that the signing of the same lease by the landowner and mineral owner has the effect of extending the mineral servitude to the end of the primary term of the lease. This concept has its origin in Mulhern v. Hayne, 171 La. 1003, 132 So. 659 (1931), where it was held that such a joinder effected an interruption of the prescription running against the outstanding mineral servitude. However, the rule of the Mulhern case was explained in Bremer v. North Central Texas Oil Co., 185 La. 917, 171 So. 75 (1936), and subsequently modified in Achee v. Caillouet, 197 La. 313, 1 So.2d 530 (1941). The result of these latter decisions was that the joinder in the lease by the landowner and mineral owner had the effect not of interrupting but merely extending the outstanding mineral servitude to the end of the primary term of the lease. Then, in Vincent v. Bullock, 192 La. 1, 187 So. 35 (1939) and Hightower v. Maritzky, 194 La. 998, 195 So. 518 (1940) this court explained that the theory behind the Mulhern case was that such a joinder clearly expressed an intent to extend the servitude in order to make the lease valid for the full primary term which extended beyond the prescription of the minerals, for, as the court observed, "The effect of a ruling in Mulhern's favor on the issue which he raised would have been to strike down the lease contract and utterly destroy the rights of his lessee." This reason, which was the sole basis for the decision, does not exist in the case at bar, for here the lease contains an after-acquired interest clause which would permit the outstanding mineral interest to revert to the landowner and nevertheless protect all rights of the lessee to the interest owned by the mineral owner at the time of the confection of the lease. The inclusion of the after-acquired interest clause in the lease before us convinces me that there was no intent to extend the life of the outstanding mineral servitude. To the contrary, this after-acquired interest clause operates as an express acknowledgment by the land and mineral owner that the mineral servitude would revert to the landowner during the primary term of the lease.

The execution of the correction deed of April 8, 1948, in itself, does not evidence an intention to interrupt or extend liberative prescription and, therefore, though it may be an acknowledgment of the existence of an outstanding mineral servitude, it does not necessarily constitute an acknowledgment which will have the effect of extending the prescriptive period.

Sanders v. Flowers, 218 La. 472, 49 So.2d 858 (1950); Union Sulphur Co. v. Lognion, 212 La. 632, 33 So.2d 178 (1947); 25 Tul.L.Rev. 303, 313 (1951).

Because a deed or correction instrument recites that the mineral ownership is "subject to prior mineral sales", an interruption of prescription is not thereby brought about. Lewis v. Bodcaw Lumber Co., 167 La. 1067, 120 So. 859 (1929).

It can be said that for an acknowledgment to have the effect of interrupting or extending the prescriptive period "there must be an express intention to do just that." Frost Lumber Industries v. Union Power Co., 182 La. 439, 162 So. 37 (1935); 1A Summers, Oil and Gas, Sec. 139 (2d ed.) (1954).

The statement that an exception of minerals "heretofore sold" was "nothing more than a statement of fact", which "did not purport to be—and was not—a waiver or an interruption of the prescription", seems to be the origin of the doctrine that the recognition of the legal existence of a mineral servitude is not an interruption of prescription. Sellington v. Producers' Oil Co., 152 La. 81, 92 So. 742 (1922).

And the execution of a division order, such as the provision in the lease before us for the division of royalties, does not estop a landowner from claiming the benefit of acquisitive prescription. Goree v. Sanders, 203 La. 859, 14 So.2d 744 (1943).

In Kennedy v. Pelican Well Tool and Supply Co., 188 La. 811, 178 So. 359 (1938), it was held that acceptance of rentals under a joint lease or the "mere acknowledgment of the existence of the rights of those in whose favor the servitude ran, * * *" was not an acknowledgment accompanied or coupled with the purpose and intention of plaintiffs to interrupt the prescription then running.

Thus, I conclude, in light of these authorities, that neither the lease nor the correction instrument contains any specific provision to show an intent to interrupt or extend the life of the mineral servitude. It would have been quite simple for the parties to stipulate to that effect, but they did not do so. LSA–Civ.Code, art. 1958. The trial court and the court of appeal agree with me in this finding.

Inasmuch as both an acknowledgment of the existence of the outstanding mineral servitude and a manifestation of an intention to interrupt or extend its life are the elements which I consider requisite to constitute an interruption or extension of the mineral servitude, it will not do to say that the outstanding mineral rights (servitude) have been "contractually" extended, as the court of appeal held, unless the contract alluded to contains these elements. The contract, whatever it is, must contain an acknowledgment of the mineral servitude and must clearly evidence an intent

to interrupt or extend the prescription then accruing.

The alternative contention of defendants, however, is not concerned with the ownership of the minerals. They argue that the stipulation for the division of royalties contained in the lease entitled them to one-fourth of the royalties as long as there is production under the lease whether or not they own a mineral interest in the affected lands.[2]

Considering this contention, it is observed that the royalty division clause in the lease is nothing more than a recognition of the rights of the parties to stated proportions of royalties under the lease. This problem was encountered in Goree v. Sanders, supra, where the court said:

"The division order is simply a statement of the respective legal rights of the various mineral and land owners in the property. Nothing is mentioned about the land owners agreeing to waive accrued prescription or to surrender or forego their rights to plead prescription that might accrue in their favor in the future."

Likewise, I see nothing in the royalty division clause in this case which manifests any intention to do anything other than declare the proportions in which the royalties were to be divided. There is nothing in the language of the clause which indicates that Mrs. Armour understood that royalties would be paid to Andrew C. Burns or his assignee, even after the expiration of the mineral interest he then owned.

The language "if production occurs", I infer, relates to their agreement that the royalties would be so divided if production occurred while each of the lessors had an interest in the lease and were entitled to production under the lease by virtue of the ownership of minerals. It could certainly not mean "if production occurs at any time in the future regardless of whether the lessors making this stipulation for the division of royalties then own an interest in the lease." This is the effect defendants would attribute to the language of the royalty division clause. But the meaning they would have us gather from the lease stipulation is not expressed and I do not think such meaning can be reasonably inferred.

Because the royalty division clause in the lease executed by the lessor is a mere declaration of the division to be made of the

2. If Andrew C. Burns and his assignee Smith are entitled to royalties by contract, it cannot be by virtue of a contract of reservation of royalties by Burns, for the life of such a royalty reservation would be limited by the life of the mineral servitude owned by Burns. Hence, to be contractually entitled to royalties, the right must come from Mrs. Armour who owned minerals at the crucial time when the production occurred and when royalties became payable.

royalties, it follows that the royalties to which the parties were then entitled would not have a longer life because of this stipulation. And this result obtains regardless of whether the proportions in which the division is to be made conforms with the exact same proportion of the mineral ownership of the lessors.

In order for the royalties due to Andrew C. Burns under the stipulation in the lease to have a full ten-year life from the date of the stipulation and not expire with the expiration of his mineral servitude, as contended by defendants, it would be necessary that the language relied upon in the royalty division clause unequivocally express the intention of Mrs. Armour to sell, or otherwise convey, a royalty interest to Andrew C. Burns independent of his entitlement to royalties as a lessor and part owner of the minerals. Royalty ownership, separate and apart from the ownership of minerals, is acquired by title; it cannot be acquired passively.

For these reasons I do not construe the language of the stipulation to be other than an agreement on the division of royalties. It is not a separate conveyance as of that date by Mrs. Armour of royalties to Andrew C. Burns or a stipulation that he should receive royalties beyond the life of his mineral servitude.

Moreover, authority supports the conclusion that a lessor who has divested himself of the entire mineral interest which gave him rights under the lease as a lessor, loses all the rights in the lease which are dependent upon his ownership of those minerals. For it is seen that "[R]oyalty * * * depends upon the continued existence of the right to which it is an appendage." Union Oil & Gas Corp. of Louisiana v. Broussard, 237 La. 660, 112 So.2d 96 (1959); Phillips Petroleum Co. v. Richard, 127 So.2d 816 (La.App.1961); Daggett, Mineral Rights in Louisiana, page 247 (1949 ed.); and "the receiving of royalties under the (a) lease is dependent and contingent upon a mineral interest ownership by the recipient at the time of their accrual." Standard Oil Co. of Louisiana v. Hightower, 3 So.2d 472 (La.App. 1941). See also Vincent v. Bullock, 192 La. 1, 187 So. 35 (1939).

Therefore, at the time production occurred, because the interest of Andrew C. Burns in the lease had been acquired by Mrs. Armour and Smith, Andrew C. Burns was without any interest. And because Smith's and Roberts' continuing entitlement to benefits (including royalties) under the lease was dependent upon the life of the mineral servitude acquired from Andrew C. Burns,[3] and because that min-

---

3. Andrew C. Burns having sold the mineral interest involved to Smith, together with the rights incident thereto in the

lease, and Smith's acquisition of the rights being no greater than the rights which Burns could convey, Smith did not

eral interest had prescribed, their entitlement to royalty under the lease also ceased to exist.

For these reasons, and because there was no separate royalty conveyance from Mrs. Armour, the defendants cannot be "contractually", or otherwise, entitled to royalties by virtue of the correction instrument or the royalty division clause of the lease.

The majority opinion opens the door to the extension of mineral servitudes beyond the ten-year prescriptive period without a clear manifestation of intent by the landowner to bring about that result. This decision is contrary to the firmly established law supported by public policy fixing the prescriptive life of a mineral servitude at ten years.

After the ten-year period of liberative prescription had run on December 6, 1949, on the mineral reservation by Andrew C. Burns in the sale to Mrs. Armour, Andrew C. Burns and Mrs. Armour executed an agreement dated March 20, 1953, which recited:

"Whereas, some question has been raised as to whether or not prescription was interrupted on the one-half (1/2) interest in the oil, gas and other minerals so reserved, by the execution

own royalties having a longer life than the mineral servitude which he acquired

of the act of correction dated April 8, 1948;

"NOW, THEREFORE, in order to remove any doubt as to the effect of the instrument dated April 8, 1948, of record in Conveyance Book 194, page 462, *SECOND PARTIES HERETO* (the landowner and her husband) do hereby expressly acknowledge and declare that it was the intention of all parties to said instrument to interrupt the running of the liberative prescription on the mineral servitude resulting from the reservation of one-half (1/2 of the oil, gas and other minerals by *FIRST PARTIES* (Andrew C. Burns and his wife), in the above mentioned deed, the said interruption to be effective as of April 8, 1948 (the date of the correction deed referred to hereinabove.)

"*IT IS FURTHER UNDERSTOOD AND AGREED* by and between the parties hereto that the execution of this instrument *SHALL NOT BE* considered as a further interruption of prescription on the mineral servitude by *FIRST PARTIES,* and that prescription thereon commenced on April 8, 1948." (Parentheses added.)

from Burns.

And, then, finally, on March 28, 1955, Andrew C. Burns and Mrs. Armour executed another agreement, the pertinent provisions of which are as follows:

> "*WHEREAS,* certain corrective instruments were later executed which have raised the question as to whether or not prescription has accrued as to said mineral interest; and,

> "*NOW, THEREFORE,* in order to remove any doubt and to finally and completely settle said question, the said *FIRST PARTY* (Andrew C. Burns) has and does by these presents acknowledge that prescription ran against any mineral interest on December 6, 1949, and he has and does by these presents relinquish, release and quit claim any and all interest in and to the minerals underlying said property." (Parentheses added.)

There is some confusion in the record concerning the stipulation of fact. There are two stipulations—one dated February 4, 1959, and one dated February 27, 1959. The first recites that the agreement of March 28, 1955, was not to be considered by the court, whereas the later stipulation, which I consider controlling, directs that both agreements, the one dated March 20, 1953, and the one dated March 28, 1955, were to be construed by the court as though they were offered in evidence on behalf of defendants and plaintiffs, re-

spectively, and their introduction in evidence objected to by opposing counsel.

The objection of plaintiff to the agreement of March 20, 1953, was that it was "irrelevant and immaterial to the issues of the case and is being offered by defendant as an attempt to resurrect an extinct servitude without any semblance of title."

The objection of defendants to the agreement of March 28, 1955, was that it was irrelevant and immaterial to the issues of the case,

> "that it could not affect any rights theretofore acquired by defendants and with respect to such rights, was null, void and of no effect, that it was an attempt to vary, alter and contradict authentic acts theretofore executed by the parties and which had been placed of public record and upon which defendants had acquired vested rights, and that it was a further attempt by parole evidence in the guise of an authentic act to vary, alter and contradict acts theretofore executed by the parties and placed of public record and by virtue of which defendants had acquired rights, that it was res inter alios acta as respects defendants; * * *."

By the stipulation, the documents were admitted subject to the objections. The record contains no reference to the actions of the courts below relating to whether

these documents were considered. I do not consider them for I feel that the objections are good. However, even if they were considered to be properly in evidence they would not alter the result which I consider proper, for at the time of their execution the mineral servitude in question had prescribed.

It is well-settled in our jurisprudence that a mineral servitude, having once become extinct by prescription, is a dead thing. English v. Blackman, 189 La. 255, 179 So. 306 (1938). It cannot be resurrected, and it can only be recreated by a new servitude. Haynes v. King, 219 La. 160, 52 So.2d 531 (1951). Thus, as this court has held before (Delta Refining Co. v. Bankhead, 225 La. 422, 73 So.2d 302 (1954), an extinguished servitude can only be recreated by title. LSA–Civil Code, arts. 783(2), 789, 3546. See also 23 Tul.L. Rev. 411 (1949).

As the court said on rehearing in Haynes v. King, supra, " * * * and we say that, although a liberative prescription of a mineral servitude may be interrupted by an acknowledgment which was made prior to the accrual of prescription, the acknowledgment will not be sufficient to renounce after the accrual of prescription."

In his dissent to the original opinion, which was reversed on rehearing, in Haynes v. King, supra, Chief Justice Fournet said that, " * * * the jurisprudence of this state is that once prescription has accrued, no acknowledgment, regardless how vigorously expressed, can serve to begin its running again."

Under the jurisprudence to which I have referred, the agreement of March 20, 1953, cannot serve to revive a mineral servitude which has prescribed. The agreement of March 28, 1955, if considered, of course, supports the result I have reached.

The judgment of the court of appeal should be reversed and set aside and the judgment of the district court should be reinstated and made the judgment of this court.

I respectfully dissent.