69 So.2d 21

**BARNSDALL OIL CO. et al.**

v.

**Succession of MILLER et al.**

No. 40974.

Dec. 14, 1953.

———◆———

Jones, Walker & Waechter, New Orleans, and Hargrove, Guyton, Van Hook & Hargrove, Shreveport, for appellants.

Wallace & Stinson, Benton, for defendants-appellees. .

McCALEB, Justice.

This is an interpleader proceeding wherein Barnsdall Oil Company (now Sunray Oil Corp.), Sohio Petroleum Company and C. H. Murphy, Jr., the assignees and owners in indivision of an oil, gas and mineral lease executed by Jessie Ann Jackson and others in favor of Sybil O'Daniel, covering 227 acres of land in Bossier Parish, have deposited certain funds accruing from the production of a gas well on said property for the purpose of having their ownership determined and also to settle conflicting interests in all future production. The claims of defendants, twelve in number, stem either from two mineral servitudes, which were executed by Jessie Ann Jackson on September 3, 1938 in favor of Paul L. Miller (now deceased) and G. G. Nesbitt, Jr., or from ownership in the land and/or minerals under titles granted subsequent to the deeds to Miller and Nesbitt. Hence, the claimants

have aligned themselves into two groups; Group "A" consists of Paul Looney Miller, administrator of the estate of Paul L. Miller, G. G. Nesbitt, Jr., O. G. Collins and Sybil Allen York. Comprising Group "B" are Jessie Ann Jackson, P. D. Oil Company; Cleave Jackson, Ford E. Stinson, V. V. Whittington, Wilmer C. Young, Sybil O'Daniel and A. M. Wallace.

In addition, Clark Salmon, Sr., the holder of a $10,000 promissory note made by Paul L. Miller on November 19, 1949, which is secured by a collateral mortgage executed by said Miller on his mineral interest acquired by Jessie Ann Jackson, intervened in the proceeding, aligning himself with the parties composing Group "A".

It appears from the record that Jessie Ann Jackson and her husband, Frank Jackson, owned the 227 acre tract in Bossier Parish for many years. Evidently burdened with debt, they lost title to the property but, on September 1, 1936, subsequent to Frank Jackson's death, Jessie Ann and her children reacquired it by deed from D. W. Brownlee in the proportions of an undivided one-half interest to Jessie Ann and the other one-half to the children as sole heirs of their father. Thereafter, by separate deeds executed on September 3, 1938, Jessie Ann conveyed to Paul Miller and G. G. Nesbitt, Jr., each a one-eighth interest in the minerals. These mineral interests would have normally become extinguished after ten years from the date of their creation, or on September 3, 1948, forasmuch as the rights

granted to Miller and Nesbitt were not exercised during that period and there was neither a suspension of the running of prescription nor an interruption resulting from an acknowledgment on the part of the landowner.

However, whereas the parties comprising Group "A" admit that there was no interruption of the running of prescription, they contend that the mineral lease executed by Jessie Ann Jackson and others in favor of Sybil O'Daniel on August 28, 1945, for a primary term of five years, effected an extension of the life of these mineral interests for as long as the lease remains in force. And, they say, that, since plaintiffs herein, the present owners of that lease, completed a gas well during September of 1949 or within its primary term, their mineral rights are extant.

· The trial judge rejected this contention (and others to which we shall later advert) being of the opinion that the lease in favor of Sybil O'Daniel is not, and was not intended to be, a joint lease. The defendants in Group "A" and the intervenor have appealed from the adverse judgment.

◼ Preliminarily, it is apt to observe that the law applicable to the principal issue presented for discussion is firmly established and that, whereas there was at one time some diversity of view in the pertinent pronouncements of this court, the seeming conflicts have long since been explained and rectified in the later cases on the subject. See Daggett on Louisiana Mineral Rights, Revised Edition, Sec. 17, pages 79–90. In matters like this, where the dominant question is whether the execution of a mineral lease, in which the landowner and mineral owner or owners appear as lessors, operates either as an interruption of prescription or to extend the servitude during the existence of the lease or produces any effect at all with respect to its life, the decision depends entirely upon the intention of the parties as revealed from the contract itself, in cases where it exhibits the true intent, or from extraneous evidence when such intention is not plainly expressed.

◼ However, parol evidence will not be considered in cases where there is a claimed interruption by acknowledgment. In those matters, in order for an interruption of the running of prescription to occur, it must clearly appear from the lease or other instrument not only that the landowner acknowledges the existence of the mineral servitude but it must also be expressed in unmistakable terms that it is his purpose in making the acknowledgment that it is to have the effect of interrupting the prescription. Nabors Oil & Gas Co. v. Louisiana Oil Refining Co., 151 La. 361, 91 So. 765; Sellington v. Producers' Oil Co., 152 La. 81, 92 So. 742; Lewis v. Bodcaw Lumber Co., 167 La. 1067, 120 So. 859; La Del Oil Properties v. Magnolia Petroleum Co., 169 La. 1137, 126 So. 684; Frost Lumber Industries v. Union Power Co., 182 La. 439, 162 So. 37; Goldsmith v. McCoy, 190

La. 320, 182 So. 519; Vincent v. Bullock, 192 La. 1, 187 So. 35; Hightower v. Maritzky, 194 La. 998, 195 So. 518 and Achee v. Caillouet, 197 La. 313, 1 So.2d 530.

■ In instances like this, where the landowner and the mineral owner have granted a mineral lease with a primary term running beyond the time when prescription for nonuser would ordinarily accrue but which does not contain an acknowledgment effecting an interruption of prescription, it has been many times professed that this act alone was indicative of an intention on the part of the landowner to extend the life of the servitude for such time as the lease remained in force and effect. However, the court, beginning with the decision in Mulhern v. Hayne, 171 La. 1003, 132 So. 659, never fully accepted this proposition, having held that the making of such a lease would constitute an extension of the servitude only in cases where it is shown that it was the intention of the parties to sign a joint lease. Bremer v. North Central Texas Oil Co., 185 La. 917, 171 So. 75; Kennedy v. Pelican Well, Tool & Supply Co., 188 La. 811, 178 So. 359; English v. Blackman, 189 La. 255, 179 So. 306; Hightower v. Martizky, supra; Spears v. Nesbitt, 197 La. 931, 2 So.2d 650; Achee v. Caillouet, supra; White v. Hodges, 201 La. 1, 9 So.2d 433 and Baker v. Wilder, 204 La. 759, 16 So. 2d 346. And, in resolving this question of fact, the court has observed in the foregoing pronouncements that it must clearly

224 La.—8

appear either from the contract itself that the landowner intended the agreement to be for the common benefit of the mineral owner and himself or, in cases where the language of the lease does not plainly express such an intention, from extraneous evidence submitted by the parties for the purpose of showing their intent.

■ When we apply the criteria set forth in the jurisprudence to the facts of the case at bar, we experience no difficulty whatever in sustaining the conclusion of the trial judge that the mineral lease of August 28, 1945 was not a joint undertaking insofar as the interest of the landowner is concerned. The lease itself, which is on a printed form, does not indicate an intention on the part of Jessie Ann Jackson and her children or their assignees, as the landowners, to join the mineral owners in the execution of a contract for the mutual benefit of all. On the contrary, other than the circumstance that it is signed by parties as lessors who are now shown to be landowners and mineral owners, there is nothing whatever to exhibit their intent. Indeed, like some of the cases to which we have referred above, it appears that the parties signed the lease on differnt occasions and in the presence of different witnesses. This, in itself, is sufficient to cast disbelief that the parties contemplated the creation of a joint obligation and warranted the introduction of parol evidence for the purpose of ascertaining their true intent.

And, when this oral testimony is examined, it confirms the view that the landowners had never purposed the execution of a joint lease with the mineral owners. The proof shows that Jessie Ann Jackson, an elderly Negro woman, was contacted by Mr. M. R. Bolinger, a well known lease broker, his objective being the acquisition of a mineral lease on the 227 acres of land for a Mr. William K. Jenkins.[1] Mr. Bolinger stated that, at the time he visited Jessie Ann and obtained her signature, none of the lessors' names appeared in the caption of the lease and that it merely contained the printed agreement which, at his request, was signed by Jessie Ann. And the latter declared that she did not know that anyone other than her children would sign the lease with her; that she was not told that anyone else would sign it and that she executed it at the request of Mr. Bolinger, whom she had known for a long time.[2]

The mineral owners, composing Group "A", have filed pleas of estoppel which are based on the idea that, since Jessie Ann Jackson had already affixed her signature to the lease when they signed it, she lulled them into the belief that it was intended to be a joint lease and that, therefore, she cannot be heard to contend otherwise for—by causing them to grant the mineral lessee the exclusive right of exploration—she deprived

them of their right to personally exercise their servitudes within the initial ten year period.

We find no merit whatever in these pleas. There was nothing done by Jessie Ann Jackson, nor any other person holding an interest in the land, which could have possibly misled the mineral owners. The circumstance that Jessie Ann had signed the lease at the time the mineral owners executed it cannot be regarded as a representation by her that the lease was a joint obligation as there was nothing contained in the lease which manifested such an intention on her part. Albeit, forasmuch as she was bereft of knowledge that these defendants would be parties to the contract, it can hardly be said that she is now precluded from contending that she voluntarily joined them in making the lease. See White v. Hodges, supra.

In the plea of estoppel filed by Mrs. Sybil A. York, one of the defendant in Group "A", it is asserted that, since she purchased the mineral interest of the defendant, O. G. Collins, after the lease was recorded in Bossier Parish, she, being a third person relying on the faith of the public records, is fully protected because the lease shows on its face that it was a joint obligation executed by the landowner and Collins. The case of English v. Blackman, supra, is cited in support of this point.

1. Actually, the lease was taken in the name of Sybil O'Daniel for purposes of convenience, according to the testimony of Mr. Bolinger.

2. As a matter of fact, the signature of Jessie Ann Jackson is admittedly witnessed by persons who did not see her sign.

■ We find no substance in the proposition. In the first place, Mrs. York cannot be regarded as a third person as she appears in the lease as a lessor, she having acquired an interest in the land from one of the children of Jessie Ann Jackson.

Furthermore, as we have stated above, the lease does not reveal on its face that it is a joint lease. Quite the contrary, the very fact that an examination of the lease discloses that the parties thereto executed it at different times would, we believe, dispel any notion that they intended joint action in the absence of clear provisions in the lease exhibiting such a purpose.[3]

■ The case of English v. Blackman, supra, is not controlling by reason of the difference in its facts. There, the lease, so far as revealed by the record, was confected between all parties at the same time and it was further found that counsel for the third parties, in examining the notarial records, had ascertained that English had accepted his pro rata share of the rentals more than ten years after the old servitudes were granted. Hence, the court concluded that Hunt and Poole were entitled to believe that it was a joint lease. In the instant case, however, the circumstance that the lease

shows on its face that it was signed by the parties out of the presence of each other was enough, we think, to place anyone on notice that the contract might not be a joint one, insofar as the landowner was concerned, in view of the jurisprudence on the subject, with which all title examiners are presumed to be acquainted.

■ What we have hereinabove said with reference to Mrs. Sybil York applies to a similar plea of estoppel filed by Mr. Clark Salmon, Sr., holder of the collateral mortgage executed by the late Paul L. Miller, bearing on his mineral interest. Mr. Salmon acquired this mortgage note on November 19, 1949, at a time when the mineral servitude in favor of Miller, which had been executed on September 3, 1938, was prescribed on its face, unless it had been extended by the execution of the mineral lease in question. And, as we have shown, this mortgagee or any other third party dealing with these mineral interests had no right to assume, from an examination of the public records, that the lease evidenced a joint obligation.

The judgment appealed from is affirmed.

HAWTHORNE, J., absent.

---

3. There is a typewritten provision, No. 13, of the lease, which declares that it is the intention of the lessors to let the land in its entirety for drilling operations. But this clause was evidently inserted long after execution of the lease as it is in different type from that contained in the other filled in parts of the printed contract and Mr. Bolinger testified (his statement is not denied) that the first time he knew of the existence of this provision was when the lease was produced in court.