86 So.2d 50 (1956)
229 La. 316
UNION OIL COMPANY OF CALIFORNIA
v.
Sevignier TOUCHET et al.
No. 42132.
Supreme Court of Louisiana.
January 16, 1956.
Rehearing Denied February 20, 1956.
*51 Hussey & Smith, Shreveport, for defendants-appellants.
Kibbe & Bailey, Abbeville, for defendant-appellee.
HAWTHORNE, Justice.
This concursus proceeding, provoked by the Union Oil Company of California, involves a 1/32 royalty. Under an order of court the company has been depositing in the registry of court the funds accruing to this royalty interest, and has cited the claimants to appear and assert their respective ownership and rights to the funds deposited. The fund accruing to the royalty interest in dispute amounted to $2,924.13 when the suit was filed. The claimants are Nemours Corporation and C. B. Small, Jr., on one part, and Sevignier Touchet on the other. Nemours Corporation and Small claim the 1/32 royalty interest by virtue of a sale of this interest made by Touchet, the landowner, on March 6, 1940. The trial judge held that the royalty interest acquired by Nemours and Small became extinguished on March 6, 1950, by the prescription of 10 years liberandi causa. Accordingly he rendered judgment ordering Union Oil Company of California to pay to Touchet all funds accrued and accruing to this royalty interest. Nemours and Small have appealed.
As we have stated above, the 1/32 royalty interest was sold by the landowner Touchet on March 6, 1940. On February 19, 1945, approximately five years after the sale of this royalty interest, Touchet executed in favor of Union Oil Company of California an oil, gas, and mineral lease having a primary term of five years and covering the property affected by the royalty interest which he had conveyed, a tract of 55.14 acres in Vermilion Parish, Louisiana. On October 28, 1948, Paragraphs 3 and 5 of this lease were amended by an instrument signed by the landowner, Touchet, and by the royalty owners, Nemours Corporation and Small. The amendment to Paragraph 3 will be discussed later in this opinion. Paragraph 5, insofar as pertinent, was amended as follows:
"Lessee at its option is hereby given the right and power without any further approval from Lessor to pool or combine the acreage, royalty, or mineral interest covered by this lease, or any portion thereof, with other land, lease or leases, royalty and mineral interests in the immediate vicinity thereof, when, in Lessee's judgment, it is necessary or advisable to do so in order to properly develop and operate said premises *52 so as to promote the conservation of oil, gas or other minerals in and under and that may be produced from said premises or to comply with the spacing or unitization order of any Regulatory Body of the State of Louisiana or the United States having jurisdiction. * * * Such pooling shall be of tracts which will form one contiguous body of land for each unit, and the unit or units so created shall not exceed substantially forty (40) acres each, surrounding each oil well and substantially 320 acres each for each gas or gas condensate well, unless a larger spacing pattern or larger drilling or producing units (including a field or pool unit) have been fixed and established by an order of a Regulatory Body of the State of Louisiana or the United States, in which event the unit or units may be of the size fixed by said order. Lessee shall execute and record in the Conveyance Records of the Parish in which the land herein leased is situated an instrument identifying and describing the pooled acreage; and upon such recordation, the unit or units shall thereby become effective. In lieu of the royalties elsewhere herein specified, Lessor shall receive from production from the unit so pooled only such portion of the royalties stipulated herein as the amount of his acreage placed in the unit, or his royalty interest therein, bears to the total acreage so pooled in the particular unit involved. Drilling or reworking operations on or production of oil, gas, sulphur, or other minerals from land included in such pooled unit shall have the effect of continuing this lease in force and effect during or after the primary term as to all of the lands covered hereby (including any portion of said land not included in said unit) whether or not such operations be on or such production be from land covered hereby. * * *" For an interesting discussion of this type of lease pooling clause, see Hoffman, Voluntary Pooling and Unitization, c. 3 (1954).
No well was drilled on the Touchet tract. Union Oil Company, however, drilled a well on a piece of land owned by Louise Thibodeaux in the immediate vicinity of the Touchet property covered by the above lease as amended. This well was completed on June 4, 1949, with 15 feet of producing formation and gas volume of 5050 MCF per day, as evidenced by the well completion report filed by the operator with the Department of Conservation.
Immediately after this well, designated as Louise Thibodeaux Well No. 1, was completed as one capable of producing gas and gas condensate in paying quantities, it was shut in because no market was available to the Union Oil Company of California for the gas which the well was capable of producing, and the rules and regulations of the Commissioner of Conservation prohibited the production of gas and other minerals from this well in the absence of a market.
On February 13, 1950, after the completion of this well and within 10 years of Touchet's sale of the royalty interest here in dispute, the lessee, Union Oil Company, filed in the conveyance records an instrument declaring that it created the Louise Thibodeaux Unit No. V. and describing a specific area of 320 acres more or less. In this unit the lease granted to the oil company by Touchet was included by authority of Paragraph 5 of the lease as amended, and among the other leases embraced in the unit was the lease of the Louise Thibodeaux tract on which the well was situated capable of producing gas in paying quantities.
Within the area of the unit as described in this declaration were the lands of one Basil Sonnier. Although the company had a lease from Sonnier, there was no provision in this lease at that time which gave the company the right to pool without further authorization by the lessor. In short, there was no provision in the Sonnier lease permitting the company to unitize by merely filing for record a declaration of unitization, as could be done under the amended Touchet lease.
The oil company was evidently aware that it had included the lands of Basil Sonnier within the area described in the pooling declaration filed by it for record on *53 February 13, 1950, without having obtained his prior consent, because the Sonnier lease was not listed in the declaration. Moreover, on October 31, 1950, the oil company obtained an amendment to Sonnier's lease authorizing unitization. This amendment was similar to the provision of the Touchet lease. Thereafter, on February 13, 1951more than 10 years from the date of the sale of the 1/32 royalty interest by Touchet, which is in dispute here, a second declaration was filed by the oil company pooling the identical area described in the declaration of unitization filed February 13, 1950; and included in this unit was the lease of Sonnier.
On January 19, 1951, the Department of Conservation authorized the oil company to produce the Louise Thibodeaux Well No. 1 to supply the gas market, and from this production the instant dispute has arisen over the funds accruing to the 1/32 royalty interest in question.
As we have already pointed out, Louise Thibodeaux Well No. 1 was completed as a well capable of producing gas and gas condensate in paying or commercial quantities within 10 years from the date of the sale of the 1/32 royalty by Touchet to Nemours and Small, as evidenced by the completion report filed by the operator with the Department of Conservation and the potential report made by the department after gauging the well. That it was such a well is fully established by the fact that the claimants here are litigating over the funds accruing to this royalty interest from production resulting from the completion of this well.
It is well settled that the right of the owner of a royalty interest is restricted to a share in production if and when it is obtained. Union Sulphur Co. v. Andrau, 217 La. 662, 47 So.2d 38, and numerous authorities therein cited. The completion of a well capable of producing oil or gas in paying quantities constitutes production, and, if such a well is completed within 10 years of the royalty sale, the royalty owner is entitled to share in the production from it.
Consequently, if the Louise Thibodeaux Well No. 1 had been located on the Touchet tract, Nemours and Small, the owners of the 1/32 royalty interest, would have been entitled to share in the production, because the well was completed capable of producing gas and gas condensate in paying quantities within 10 years from the date of the royalty sale, and their right to share in such production would not have been lost by the fact that the well was shut in for want of market and no gas was sold or marketed from it until after the expiration of 10 years from the date of the royalty sale. See Sohio Petroleum Co. v. V. S. & P. R. R., 222 La. 383, 62 So.2d 615.
Since the Louise Thibodeaux Well No. 1 was not located on the lands subject to the royalty right, there was no production from this tract and the royalty right here in dispute has prescribed for want of production, unless the operating unit formed by means of the declaration filed by the Union Oil Company on February 13, 1950, within 10 years of the date of the royalty sale,[1] was valid; for, if so, then the area comprising the unit is treated as one tract and one lease, and production from any portion of the area making up the operating unit has the same effect on property situated within the unit as if the well was drilled and completed on each of the various tracts of land embraced in the area and under each of the leases. Accordingly, if the operating unit formed by the first declaration filed by the oil company was valid and effective, the royalty right has not prescribed.
Touchet's land and lease were included within the area of the operating unit as described in the declaration filed by the oil company pursuant to the provisions of Paragraph 5 of the amended lease granted by Touchet to the company. The right granted the oil company under this lease pooling *54 clause was very broad. It gave to the company "the right and power without any further approval from Lessor to pool or combine the acreage, royalty, or mineral interest covered by this lease, or any portion thereof, with any other land, lease or leases, royalty and mineral interests in the immediate vicinity * * *". (Italics ours.) The question thus presented is whether the company had authority under this broad provision to combine Touchet's land with any other land or lease in the immediate vicinity in the absence of consent and approval by that particular landowner. If the lease gave such authority, the oil company would be permitted, by pooling Touchet's land or lease with any tract or lease in the immediate vicinity on which there was production, to perpetuate its lease beyond the primary term without drilling or securing production from the property covered by its lease from Touchet, and this could be done without objection on the part of the landowner. Such a result would be unthinkable.
Obviously the only meaning that this provision of the lease could have was that the lessor granted to the lessee authority to combine his lease with any other land or lease in the vicinity which the oil company also had authority to unitize.
As we have heretofore pointed out, the operating unit formed by the first declaration of February 13, 1950, included within the unitized area the lands of Basil Sonnier, which were placed in the area of the unit without Sonnier's consent. Consequently, this unit was not a unit created pursuant to the power and authority granted to the oil company by Touchet under the provisions of Paragraph 5 of his lease as amended, and hence the unit was not valid. This being so, production from the Louise Thibodeaux Well No. 1 could not at that time be considered production from the Touchet land. Therefore, since there was no production from the Touchet tract within 10 years from the date of the royalty sale, the 1/32 royalty interest has been lost by the prescription of 10 years liberandi causa.
Immediately after the invalid unit was formed on February 13, 1950, the oil company deposited to the account of Touchet in the Bank of Erath each month a sum equal to 1/12 of the annual rental of $275.70 provided in the original lease. The first of these deposits was made on February 14, 1950, and they were continued until production from the well was marketed in January, 1951. Only one of these deposits, amounting to $22.98, was made within 10 years of the royalty sale. These deposits were made under the terms of Paragraph 3 of the lease as amended, which provided, among other things, that, if during the primary term of the lease there was on the land leased a well or wells capable of producing gas or gas condensate and this lease was not being maintained by production of such gas, the lessee could maintain its rights under the lease from month to month by paying the lessor or by depositing to his credit in the Bank of Erath a sum equal to 1/12 of the annual rental provided in the original lease; that each payment was to extend the lessee's right for a period of one month from the due date thereof, and during each month for which payment should be made the lessee would be relieved of all drilling or other requirements under the lease.
The royalty purchasers argue that these deposits were "shut-in royalties", and that, because these payments were deposited to Touchet's account in the bank without protest on his part, he is now estopped to contend that their royalty interest has prescribed.
To sustain this plea of estoppel we should have to hold, under the conclusion we have reached in this case, that Touchet is estopped to contend that the operating unit formed by the declaration of the oil company filed on February 13, 1950, was ineffective.
Estoppel is not favored under our jurisprudence, and the burden of proving *55 the facts to establish it rests on the one relying on the doctrine. Arkansas Louisiana Gas Co. v. Thompson, 222 La. 868, 64 So.2d 202. For the plea of estoppel to be well founded in the instant case, the royalty purchasers would have had to prove that Touchet acted with knowledge of all the facts and of his rights. See Michel v. Efferson, 223 La. 136, 65 So.2d 115 (on rehearing). There is no evidence whatever showing that at the time these deposits were made Touchet had any actual knowledge that the declaration of unitization filed by the oil company on February 13, 1950, included in the area of the unit the lands of Basil Sonnier which the oil company did not have authority to pool or unitize. See 31 C.J.S., Estoppel, § 109(b), p. 349.
As we have already pointed out, Paragraphs 3 and 5 of the original lease were amended by instrument dated October 28, 1948. Small and Nemours joined in this amendment by signing the instrument for the purpose shown in the document itself, namely: "And now comes and joins herein C. B. Small, Jr., and Nemours Corporation, the owners of royalty rights in said land and ratify and confirm the agreements herein set forth and particularly agree that in the event of pooling or unitization of said land or any part thereof, their royalty rights shall be subject to the provisions of Paragraph 5 of said lease as herein amended."
The royalty claimants say that the execution of this document preserved their royalty rights beyond the 10-year prescriptive period. We fail to see any valid basis for this argument. It would have been possible for Touchet to have expressed his intention in the amended lease either to interrupt the 10-year prescription that was running against the royalty owners, thus starting it anew, or to extend these royalty rights during the entire existence of the lease. However, it is a firmly entrenched principle of Louisiana mineral law that no act on the part of a landowner will have the effect of extending the life of a mineral interest unless it is shown that there was a clear intention on the part of the landowner to achieve that very result. Thus, mere acknowledgment by a landowner of the existence of a mineral servitude is insufficient to interrupt the running of prescription unless the instrument containing that acknowledgement, or extraneous evidence submitted by the parties, clearly shows that it was the purpose of the landowner in making acknowledgement to interrupt the running of prescription. Barnsdall Oil Co. v. Succession of Miller, 224 La. 216, 69 So.2d 21, and authorities there cited. In the instant case there is nothing in the amended lease to suggest that Touchet wanted to interrupt the 10-year prescription that was running against the royalty owners, or to extend their rights for the duration of the lease, and no extraneous evidence was submitted by the royalty owners to show such an intent on Touchet's part. The document signed by Small and Nemours in October of 1948 is no more than their written consent to the pooling of their royalty rights by the oil company.
The judgment is affirmed, all costs to be paid from the fund on deposit in the registry of the court.
PONDER, J., absent.
McCALEB and HAMITER, JJ., dissent with written reasons.
McCALEB, Justice (dissenting in part).
I am in accord with the ruling that the completion of the Louise Thibodeaux Well No. 1, which was capable of producing gas in paying quantities, preserved the rights of the royalty owners despite the fact that the well was shut in for want of a market and that no gas was sold or marketed from it until after expiration of ten years from the date of the royalty sale. And I am also willing to concede that, notwithstanding the unqualified right granted by Touchet in his lease to the oil company to pool or combine his acreage with any other land, leases or mineral interests in *56 the immediate vicinity for the purpose of forming a production unit, it was subject to an implied condition that the oil company had or would obtain similar authority from the owners of all other lands forming the unitized area and that, in the absence of the consent of all such owners, the unit could be dissolved by any person adversely affected thereby.
But I do not agree it necessarily follows that, because the oil company did not have the consent of Basil Sonnier, whose lands were included within the unitized area, at the time the operating unit was formed by the declaration of February 13, 1950, the original formation of the unit was illegal in view of the fact that the oil company subsequently obtained Sonnier's consent which, in my opinion, was nothing more than his ratification of the oil company's act in placing his land within the unit prior to the time prescription had accrued against the rights of the royalty owners.
If, as above pointed out, the unqualified consent to unitize given the oil company by Touchet is considered burdened with the implied condition that it was not to be effective unless the oil company obtained the consent of all of the landowners whose land formed the unit (a ruling most favorable to Touchet), his contention should not be sustained as it is a familiar principle of law that, when an obligation is dependent upon the performance of a condition, the condition, when performed by the obligor, has retroactive effect.
Article 2041 of the Civil Code provides, in part, "The condition being complied with, has a retrospective effect to the day that the engagement was contracted". Thus, when the oil company obtained the consent of Sonnier to the formation of the unit by the pooling declaration filed by it for record on February 13, 1950, that declaration became binding on all parties thereto, not from the date that Sonnier gave his consent but as of the date of its filing. To hold otherwise would deny to the other members of the pooling unit, other than the owner of the well site, the right to participate in production until such time as a new unit is formed with the express consent of all parties thereto.
I am also of the opinion that Touchet's acceptance of "Shut-in royalties" estops him from now contending that there was no production attributable to his land during the ten year royalty period.
I respectfully dissent.
HAMITER, Justice (dissenting).
As is shown in the majority opinion the unitization declaration of February 13, 1950, which contained a description of the Sonnier land, was initially invalid solely because the lessee had not previously obtained authority from Sonnier to incorporate his property in the unit. However, in my opinion, such declaration was retroactively ratified by implication and rendered valid as of such date by the authorization to unitize which Sonnier granted on October 31, 1950. LSA-Civil Code Article 1840; Acadian Production Corporation of Louisiana v. Savanna Corporation, 222 La. 617, 63 So.2d 141 (and cases therein cited). As a consequence, particularly since in the meantime Touchet made no complaint as to the unit originally created but rather received shut-in royalties from the unitized lands, the royalty interest of appellants was not lost by the prescription of ten years liberandi causa (apparently for the same reason the Touchet lease, dated February 19, 1945, continued in force and effect after the expiration of its primary term of five years.
I respectfully dissent.
NOTES
[1] The second declaration discussed herein was filed by the oil company more than 10 years after the date of the royalty sale.