Frederick M. GORENFLO

v.

TEXACO, INC., Amarex, Inc., Ennex, Ltd. and Ennex, Ltd., II.

Civ. A. No. 81–662–B.

United States District Court, M.D. Louisiana.

June 23, 1983.

**723**

J. Clayton Johnson, W.S. McKenzie, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for Ennex, Ltd. and Ennex, Ltd., II.

POLOZOLA, District Judge:

This suit seeks to have the Court cancel a mineral lease on property located within the gas-rich Tuscaloosa Trend. Frederick M. Gorenflo, the landowner, has filed this action against Texaco, Inc., Amarex, Inc., Ennex, Ltd. and Ennex, Ltd., II.

On May 14, 1975, a lease was granted to Texaco by the plaintiff and the other co-owners of the property. The primary term of this lease was five years. During the primary term of the lease, Texaco subleased a portion of its interest in the lease to Ennex. In February of 1980, Amarex and Ennex entered into an agreement whereby Amarex would drill a well or wells to develop the properties held under lease or sublease by Ennex and would earn an interest in the leases by drilling to the Tuscaloosa Trend formation. The Milford Cobb No. 1 well was permitted on April 3, 1980. A location shift of 200 feet was permitted on May 1, 1980. Ennex declared a 160 acre unit around the Milford Cobb No. 1 on May 9, 1980. This 160 acre unit included the plaintiff's property as well as properties belonging to other landowners whose mineral leases were about to expire. At the time the unit was declared on the Milford Cobb No. 1, extensive preparations for drilling had already been made at the Milford Cobb No. 1 site. Between May 9, 1980, and May 14, 1980, the oil companies made inspections of drill pipe and placed portions of the drilling rig on the well site. On May 20, 1980, the plaintiff acquired an undivided interest of a 7.267 acre tract, which is the subject of this litigation, through a voluntary partition of the original lease property. The well on the unit containing plaintiff's property was spudded in on May 21, 1980. Production was obtained later and has continued since. The issue before the Court is whether the operations conducted by the defendants in the unit which included plaintiff's property prior to May 14, 1980, the expiration date of the mineral lease, were

Ernest R. Eldred, Jerry F. Davis, Baton Rouge, La., for plaintiff.

G. William Jarman, Sanders, Downing, Kean & Cazedessus, Baton Rouge, La., for Texaco, Inc.

Edward B. Poitevent, III, Herschel L. Abbott, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Amarex, Inc.

unit operations which kept plaintiff's mineral lease from expiring.

The plaintiff contends that since his land was not validly unitized with the Milford Cobb lease, operations and production from the purported "unit" did not maintain the lease on his land. Plaintiff sets forth the following reasons to support his contention: (1) the unit is invalid since one of the leases listed on the unit declaration was null because it was signed by a lessor purporting to act on behalf of minors ten days prior to her actual appointment as tutrix and receipt of court authorization to execute the lease; (2) the judgment of homologation authorizing the tutrix to execute the lease was not recorded in the parish conveyance records; (3) the pooling clause of the plaintiff's lease did not authorize declaration of a unit for drilling an exploratory well, but only allowed such a declaration after production was obtained; (4) the unit declaration was made in bad faith; (5) even if the unit was valid, the well was not properly identified at the site and legally permitted, so that the alleged "unit operations" could not have legal effect as such; and, (6) the operations conducted on the Cobb tract prior to the end of the primary term were insufficient to hold the lease.

The defendants contend the plaintiff's arguments are without merit. More specifically, defendants contend that the mineral lease granted the defendants the right to form a unit to drill the well and that the unit was valid. Defendants further contend that the operations conducted in the unit prior to the expiration of the primary term of plaintiff's lease extended the term of the lease. Finally, defendants contend they acted in good faith and drilled a well which was in a location which promoted conservation, avoided the drilling of unnecessary wells, complied with spacing requirements and was productive.

After reviewing the voluminous record in this case, the Court finds that plaintiff's suit to cancel the mineral lease on his property must be dismissed. The Court finds that the primary term of the May 14, 1975 mineral lease was properly and lawfully extended by the defendants.

Each of the contentions raised by the plaintiffs shall be discussed separately.

## THE VALIDITY OF THE GERVASI LEASE

One of the leases contained in the unit which included plaintiff's lease was the so-called Gervasi Lease. The plaintiff disputes the validity of the Gervasi Lease. Plaintiff contends the Gervasi Lease was executed without proper court authority and the judgment of homologation authorizing execution of the lease was not properly recorded. These contentions are without merit.

Patricia Hayes Davis Gervasi, as tutrix of her two minor children, Larna LeJeune Davis and William Rufus Davis, III, executed a mineral lease on the children's behalf with Exxon. The lease document was transmitted to Mrs. Gervasi from Exxon and was to be returned by her to Exxon after proper authorization was received from the court. It is clear that Exxon would and did not authorize payment to Mrs. Gervasi in consideration of the lease until court authorization was obtained and the completed papers were received by Exxon. Mrs. Gervasi signed the lease on October 7, 1977. She was appointed as tutrix and authorized to sign the lease on behalf of her children on October 17, 1977. The judgment of homologation made a particular reference to the lease in question. The court also authorized Mrs. Gervasi to "execute" the lease. In simple terms, the judgment rendered by the court authorized Mrs. Gervasi to return the signed lease to Exxon and to conclude the contract on behalf of her children. This Court's conclusion that the Gervasi Lease was properly executed is supported by the Louisiana jurisprudence. Thus, in *Southern Enterprises, Inc. v. Foster,* 12 So.2d 842 (La.App. 2nd Cir.1942), aff'd. 203 La. 133, 13 So.2d 491 (1943), the Second Circuit Court of Appeal defined the words "execution" and "execute" as applied to written instruments. The court stated that the "word 'execution' when applied to a written instrument means all of those formal acts

that are essential to its effectiveness." 12 So.2d 844. The court defined "execute" as follows: "To complete, as a legal instrument; to perform what is required to give validity to, as by signing and perhaps sealing and delivering; as to execute a deed, will, etc." Id. Thus, acting with court approval, the Gervasi Lease was properly executed and delivered to Exxon. Plaintiff relies on *Union Oil Co. v. Touchet,* 229 La. 316, 86 So.2d 50 (1956) to support his argument that a defect in the title to one of the tracts within a unit invalidates the entire unit. However, Touchet does not apply under the facts of this case because the Court has found that the Gervasi Lease was properly executed and, therefore, valid.

Plaintiff also contends that the failure to record the judgment of homologation in the conveyance record makes the Gervasi Lease invalid under the public records doctrine. This contention is totally without merit.

The Louisiana public records doctrine, which is set forth in La.R.S. 9:2721 and 2722, provides:

§ 2721. Filing in office of parish recorder

No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated; and neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties. Acts 1950, 2nd Ex.Sess., No. 7, § 1.

§ 2722. Persons protected

Third persons or third parties so protected by and entitled to rely upon the registry laws of Louisiana now in force and effect and as set forth in this Chapter are hereby redefined to be and to include any third person or third party dealing with any such immovable or immovable property or acquiring a real or personal right therein as purchaser, mortgagee, grantee or vendee of servitude or royalty rights, or as lessee in any surface lease or leases or as lessee in any oil, gas or mineral lease and all other third persons or third parties acquiring any real or personal right, privilege or permit relating to or affecting immovable property. Acts 1950, 2nd Ex.Sess., No. 7, § 2.

It is clear that the public records doctrine is intended to protect those who rely upon the public records in "acquiring any real or personal right, privilege, or permit relating to or affecting immovable property" or who "deal with" a particular immovable affected by the unrecorded document in question. It cannot be said under the facts of this case that the plaintiff "relied upon" the absence from the conveyance records of the Gervasi judgment of homologation in acquiring his property or in "dealing with" the Gervasi Lease. The Court's conclusion is supported by a decision rendered by the Louisiana Supreme Court in *Wells v. Joseph,* 234 La. 780, 101 So.2d 667 (1958). In the *Wells* case, the Louisiana Supreme Court recognized the provisions of La.R.S. 9:2721, as well as the similar dictates of Art. 2266 of the Louisiana Civil Code. However, the Court stated that, along with the broad protection given to third parties by the public records doctrine, the law also imputes constructive notice to such parties of the existence and contents of recorded instruments affecting immovable property. Thus, the Supreme Court concluded that:

" * * * where such an instrument contains language that fairly puts a purchaser on inquiry as to the title and he does not avail himself of the means and facilities at hand to obtain knowledge of the true facts he is to be considered as having bought at his own risk and peril."

\*      \*      \*      \*      \*      \*

" * * * The defendants cannot single out one instrument on the records and disregard the other instruments * * *. The records as a whole must be taken into consideration and they are bound by what they reveal. * * * " 101 So.2d at 670.

In the case *sub judice,* there was a mineral lease of record from "Patricia Hayes Davis

Gervasi, born Hayes, widow of William R. Davis, Jr., married to Gino A. Gervasi, as duly authorized and court approved tutrix of her minor children, Larna LeJeune Davis and William Rufus Davis, III, single," in favor of Exxon Corporation. It cannot be seriously argued that this recorded mineral lease would not fairly put a third person on inquiry as to the interest acquired by Exxon.

Even if the Court would conclude that the plaintiff is a "third party" protected by the public records doctrine, *Wells* will not allow the plaintiff to single out the judgment of homologation as missing and disregard the mineral lease on behalf of Exxon.

Finally, there is one additional reason why the public records doctrine does not apply in this case. In order for the unit containing plaintiff's lease to be invalid, *Union Oil Co. v. Touchet,* supra, must apply. In *Touchet,* the Court concluded that the declared unit was invalid because one of the leases included in the unit did not contain a pooling clause which granted the lessee the right to declare a unit. Plaintiff seeks to extend the interpretation made by the Court in *Touchet.* However, *Touchet* does not apply under the facts of the case pending before this Court. The Gervasi Lease granted to Exxon the power to declare units. Thus, it is immaterial whether the plaintiff may rely on the absence of the judgment of homologation from the conveyance records. *Touchet* merely provides that Gorenflo's lease which contains a pooling clause cannot be pooled with a lease which does not contain a similar pooling clause. All of the leases involved in this case contained similar pooling clauses. Thus, plaintiff's argument is without merit.

## EXPLORATORY WELLS ARE PERMITTED UNDER THE POOLING CLAUSE

■ A careful analysis of the pooling clause contained in the plaintiff's lease reveals that the clause authorized the defendants to declare a unit for the purpose of drilling an exploratory well. Paragraph Seven (7) of the lease authorizes the lessee to declare a unit under the following conditions:

"Lessee is hereby granted the optional right, at any time, and from time to time, either before or after production is obtained, to form or to reform a unit or units covering the leased premises or any portion or portions thereof, as to all strata or any stratum or strata, with any other lands as to all strata or any stratum or strata for the production primarily of oil or primarily of gas with or without distillate, when, in Lessee's judgment, it is necessary or advisable to do so in order to properly develop and operate said premises so as to promote the conservation of oil, gas, or other minerals in and under and that may be produced from said premises, to prevent waste, to avoid the drilling of unnecessary wells, or to comply with the spacing or unitization orders of any regulatory body of the state or the United States having jurisdiction."

Paragraph Seven (7) therefore, grants the lessee the right to declare a unit when, in its judgment, creation of a unit is advisable and necessary to properly develop and operate the property so as to promote conservation, prevent waste, avoid the drilling of unnecessary wells, or comply with spacing or unitization orders.

The plaintiff, on the other hand, contends that the unit has to be for production. In essence, the plaintiff contends that the words "develop and operate" in Paragraph Seven (7) of the lease do not authorize the lessee to form a unit for exploration purposes but refer only to activities conducted subsequent to the discovery of commercial hydrocarbons. According to the plaintiff, the formation of a unit for exploration purposes does not promote conservation, prevent waste, avoid the drilling of unnecessary wells, or comply with spacing requirements of the Louisiana Department of Conservation.

Articles 1946 and 1947 of the Louisiana Civil Code require the Court to interpret the words "develop and operate" in accordance with their received meaning within the oil and gas industry. It is clear from the evidence presented at the trial that the word "develop" as used in the oil and gas

industry contemplates any step taken in the search for, capture, production and marketing of hydrocarbons. Thus, the word "develop" as used in the industry clearly contemplates and includes exploration. The Louisiana courts have interpreted the word "develop" as used in this lease in a similar manner. In *Waseco Chemical & Supply Co. v. Bayou State Oil Corp.,* 371 So.2d 305, 307 (La.App. 2d Cir.1979), the court stated that "development ... is not only the *exploration for* but the exploitation of or the capture of and marketing of the minerals which may have been discovered by the fulfillment of the lessee's obligation to explore." (emphasis supplied).

Furthermore, the pooling clause in the plaintiff's lease authorized the lessee to declare a unit "either before or after production is obtained." Although the ultimate goal of the lessee in conducting unit operations is obviously "the production primarily of oil or primarily of gas", Paragraph Seven (7) does not require production to have been obtained prior to the declaration of the unit. For these reasons, the Court finds that the lease authorizes the lessee to declare a unit for exploration purposes.

The Court also finds under the facts of this case that the formation of the unit and the drilling of the Milford Cobb # 1 well promoted conservation, avoided the drilling of unnecessary wells on other tracts within the unit and complied with the spacing requirements of the Louisiana Department of Conservation. The evidence presented at trial demonstrated that the well was located in the optimum location to find gas and to efficiently drain the reservoir. The declared unit was the most efficient method to develop the minerals under the leases on the multiple tracts located in the vicinity of the site. Ennex had mineral lease contracts on several area tracts ultimately unitized. The main consideration and obligation owed by Ennex to its lessors was the development of their premises. *Carter v. Arkansas Louisiana Gas Co.,* 213 La. 1028, 36 So.2d 26, 28 (1948); *Vetter v. Morrow,* 361 So.2d 898, 899 (La.App. 2nd Cir.1978). Ennex could have fulfilled this obligation by drilling wells on each of the leased tracts. How-

ever, such an undertaking might not have been productive and could have necessitated additional and expensive drilling in the same area to develop the acreage. Also, if wells had been drilled on each of the tracts, there would not have been efficient drainage of the reservoir. Ennex would, under those circumstances, not have been fulfilling its duty to develop the tracts as a prudent operator. See LSA—*Min.Code* art. 122.

## THE DEFENDANTS ACTED IN GOOD FAITH IN THE EXERCISE OF THE POOLING OPTION

The next issue to be resolved by the Court is Gorenflo's argument that the defendants did not declare the unit in good faith. The plaintiff argues that the declaration was made solely to benefit the lessee. He contends that the unit was gerrymandered to include expiring leases in the vicinity of the well. Gorenflo also notes that the defendant ultimately expected the Commissioner of Conservation to create a 640-acre Commissioner's unit which would replace the 160-acre declared unit.

The primary argument made by the plaintiff in support of his charge of bad faith is that the unit was intended to keep alive four leases which had primary terms ending in May of 1980. Ennex personnel admitted during the trial that they formed the unit to protect Ennex's equity position by holding leases that were soon to expire. However, the evidence also conclusively showed that, in addition to holding the leases, the unit formation and the well location prevented the wasteful drilling of unnecessary wells, constituted the most efficient drainage of the acreage involved and comported with the conduct expected of a prudent operator. A similar factual situation was presented to the Court in *Boone v. Kerr-McGee Oil Industries,* 217 F.2d 63 (10th Cir.1954). There, a unit was declared by a lessee only a few months prior to the expiration of the primary terms of a number of leases in an area. The trial court found the unit to be valid and rejected arguments that the lessee had acted in bad

faith. The Court further found that the actions of the lessee were taken for the purposes of properly developing and operating the premises in the interest of conservation of oil, gas and other minerals and to extend the leases beyond their primary terms. The Tenth Circuit Court of Appeals affirmed the decision of the lower court. The Tenth Circuit observed that the lessee was faced with the decision of whether to drill individual wells under the terms of each lease or to pool the acreage and produce it under one well. The record in the *Boone* case, as here, indicated that additional wells would have been wasteful, would not have resulted in the ultimate recovery of additional gas, and would have detrimentally affected the recovery of oil from other leases due to dissipation of gas pressure. Drilling additional wells would have also caused financial loss to the driller. Faced with these circumstances, the *Boone* court found that the lessee exercised wise and sound discretion. The fact that the primary terms of the lease were about to expire did not render the decision of the lessee arbitrary. Neither did the pooling arrangement become arbitrary "merely because it relieved the lessee from ruinous, wasteful drilling operations which would be necessary if it wanted to retain its leases, even if that was one of the factors it had in mind at the time it reached its decision." 217 F.2d at 66. *Boone* has been cited often with approval by commentators and the courts. See, e.g. Hoffman, *Pooling Unitization Clauses in Oil Leases,* 1 Rocky Mtn. Min.Law Inst. 103, 116 (1955); and, Williams & Meyer *Oil and Gas Law,* § 670.2 p. 86.2 (1981), where the authors note that in most instances where the pooling clause authorizes pooling "at any time", as in this case, "there is no reason for complaint by the lessor" that the action came shortly before the primary term ended. For this Court to rule otherwise would reduce the primary term of a lease to a shorter period than contemplated by the parties.

Plaintiff's contention that the unit was gerrymandered is without merit. The testimony indicated that the well was at the optimum location for drainage according to available seismic data. Although the unit was not precisely centered about the well, the evidence demonstrated that the unit boundaries were necessarily located as they were to avoid a suspected fault which otherwise would have prevented unit acreage from being drained by the Cobb well. As drawn, the well drains all acreage located in the unit. Plaintiff's reliance on *Amoco Production v. Underwood,* 558 S.W.2d 509 (Tex. Civ.App.1977), is misplaced. There, the unit excluded potentially productive acreage and included land unlikely to be drained in an obvious attempt to hold maximum leased acreage in disregard of data indicating a more prudent unit configuration. Such were not the facts presented at the trial of the case before this Court.

The Court further finds that the future possibility of a 640-acre Commissioner's unit in the vicinity of the Cobb No. 1 at the time of the unit declaration is irrelevant to the issue of good faith. The pooling clauses of some of the leases contained in the unit limited their authorization to 160-acre units. As a matter of policy, the Louisiana Commissioner of Conservation will not establish units by governmental order until the discovery well is successfully tested. In light of the circumstances facing the defendants at the time the unit was declared, the course they undertook was a sound and wise exercise of the discretion granted to them under the lease. *Boone v. Kerr-McGee, supra.* Therefore, the Court finds that the defendants acted in good faith when exercising their rights under the pooling clause.

THE WELL WAS PROPERLY PERMITTED

█ The plaintiff also argues that, even if the leases were validly pooled and even if operations were timely commenced at the Milford Cobb No. 1 site, such operations were not unit operations because they were not permitted as such by the Department of Conservation on the date the primary term expired. After the unit declaration on May 9, 1980, the name of the well was not changed until May 19, 1980, when an amended permit changed it to "VUA: Mil-

ford F. Cobb No. 1 Well." This amendment indicated that the well was a unit well. According to the plaintiff, operations on the Cobb site did not count as unit operations until the Department of Conservation designated the well as a unit well.

The plaintiff's argument is totally without merit. The authorities cited by the plaintiff in support of his argument—LSA–R.S. 30:204; LSA–R.S. 30:4; Office of Conservation, Statewide Order 29–B, Section II A, C, D,—do not support his contention. These authorities provide that prior to the actual commencement of drilling, a permit therefor must be issued by the Department, and a sign must have been posted on the derrick containing certain information before drilling goes below the surface casing. The cited provisions do not indicate that drilling under a permit which gives the well a name which does not show its status is illegal. Furthermore, all of the operations in question preceded the drilling and, therefore, do not require permitting of any sort. The well in question was not spudded in until May 21, 1980, after a "proper" permit was issued.

## SUFFICIENT OPERATIONS WERE CONDUCTED PRIOR TO THE EXPIRATION OF THE PRIMARY TERM OF THE LEASE

■ The last issue to be disposed of is whether sufficient operations were conducted on the unit prior to the expiration of Gorenflo's primary term to maintain the lease. Paragraph Seven (7) of the lease provides that "[o]perations upon and production from the unit shall be treated as if such operations were upon or such production were from the leased premises whether or not the well or wells are located thereon." The obvious intent of this provision is clear and self-explanatory. Paragraph Four (4) of the lease provides for the continuation of the lease by "drilling operations" and states that such operations "shall be deemed to be commenced when the first material is placed on the leased premises or when the first work, other than surveying or staking a location, is done thereon which is necessary for such operations." Clearly,

the actions taken by the defendant between May 9, and the end of the day on May 14, meet this definition, even if the plaintiff is correct that activities prior to May 9, may not be considered "unit operations."

The plaintiff contends that the "operations" in Paragraph Seven (7) of the lease are not the same as "drilling operations" in Paragraph Four (4) which will keep the lease alive. There is no basis for this distinction. The lease clearly provides what activity extends the lease. Paragraph Seven (7) deems this activity as occurring on the lease property if done on the unit. According to the plaintiff, "operations" only includes activity performed after a well has been drilled. However, Paragraph Seven (7) simply does not provide that a well must already have been dug before operations will be considered. The concept of the constructive effect of activity anywhere on the unit, so that all such activity will be deemed as if performed on the leased tract, is the "heart of the pooling agreement". Some courts have even implied this where it was not specified in the agreement. Hoffman, *Pooling and Unitization Clauses in Oil Leases,* supra, at p. 110. Section 114 of the Louisiana Mineral Code also provides for this effect where it is not contractually excluded. The wording of the lease indicates the parties' intention to provide this result in this case.

## CONCLUSION

For the reasons set forth above, the Court must conclude that the plaintiff's suit must be dismissed with prejudice.

Judgment shall be entered accordingly.