**MESA PETROLEUM COMPANY**

v.

**U.S. DEPARTMENT OF INTERIOR.**

Civ. A. No. 84–1967–LC.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Nov. 10, 1986.

A. Lane Plauche and James R. Nieset, Plauche, Smith & Nieset, Lake Charles, La., Daniel Joseph, Jerry E. Rothrock and David A. Holzworth, Washington, D.C., Betty H. Little, Mesa Petroleum Co., Amarillo, Tex., for plaintiff.

Rebecca A. Donnellan, Land & Natural Resources, Div. U.S., Dept. of Justice, Geoffrey Heath, Office of the Sol., Dept. of the Interior, Washington, D.C., Lawrence W. Moon, Asst. U.S. Atty., Lafayette, La., for defendant.

## OPINION

VERON, District Judge.

The plaintiff, Mesa Petroleum Company ("Mesa"), has leased certain offshore lands from the United States. In this declaratory judgment action Mesa challenges the authority of the defendant, the United States Department of the Interior ("DOI"), to require Mesa to pay royalties on monies Mesa receives from Tennessee Pipeline Company ("Tennessee") as "take-or-pay" payments made pursuant to the terms of a natural gas purchase and sales contract between Mesa and Tennessee.[1] The matter is now before the court on cross-motions for summary judgment. After considering the pleadings and memoranda of law submitted by the parties, as well as the oral argument heard August 1, 1986, the court determines that the plaintiff's motion for summary judgment should be granted and the defendant's motion for summary judgment denied.

## FACTS

On August 1, 1973 Mesa, together with three other oil and gas exploration companies, leased from the United States submerged lands on the Outer Continental Shelf. The lease, No. OCS–G 2421, was issued by authority of the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356 (1986) ("OCSLA"), and made subject to all the provisions of OCSLA and to all terms, conditions and requirements of the valid regulations promulgated by the Secretary of the Interior. The terms of the

1. In addition to the claim for declaratory relief, Mesa originally also sought an injunction enjoining the Department of the Interior from assessing or collecting royalties on "take-or-pay" receipts and a writ of mandamus ordering the Department of the Interior to submit to Congress an audit of royalty overpayments made by Mesa and to offset any royalty underpayment by Mesa's overpayments. The Department of the Interior has agreed not to enforce its order demanding payment of royalties on take-or-pay payments until a final judgment has been rendered and Mesa's claim for refund of royalty overpayments has been settled; therefore, the claims for injunctive relief and a writ of mandamus are no longer before this court.

lease require Mesa "[t]o pay the Lessor a royalty of 16⅔ percent in amount or value of production saved, removed, or sold from the leased area."

Mesa sells its share of natural gas from the leased area exclusively to Tennessee under a natural gas purchase and sales agreement, originally entered into on August 8, 1977 and later amended. Under the agreement Tennessee generally pays for natural gas at the maximum lawful price permitted by the Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301–3342 (1982), for the month in which the natural gas is produced.

In return for Mesa's agreement to sell exclusively to Tennessee, Tennessee agrees to pay for a specified minimum quantity of natural gas each contract year. To the extent Tennessee takes less than the contract minimum in a given year, it must make a "take-or-pay" payment to Mesa. Tennessee then has seven years in which to "make up" the deficiency by crediting against the deficiency the value of any natural gas it takes in excess of the contract minimum. The purpose of the "take-or-pay" provision is to guarantee Mesa a steady flow of revenue to meet its operation and maintenance costs.

On June 1, 1984 the Mineral Management Service ("MMS") issued a demand letter to Mesa ordering the payment of $1,001,849 for overdue royalty payments. The audits revealed that on August 17, 1981 Mesa received a take-or-pay payment from Tennessee in the amount of $25,001,385 and that Mesa did not then pay royalties upon receipt of this payment. The audit further revealed that as of June 30, 1983 Tennessee had taken sufficient make-up gas to reduce its deficiency to $6,011,094.[2] Mesa paid royalties as it produced the make-up gas, so the amount demanded by the DOI represented the additional royalties it claimed were due on the unrecouped deficiency.[3]

On July 6, 1986 Mesa gave Notice of Appeal of the June 1, 1984 order. Mesa argued in their appeal that royalties were not due on take-or-pay payments because under the lease, OCSLA and DOI regulations, royalties must be paid only on production saved, removed, or sold, and production does not occur when Tennessee elects not to purchase natural gas.

On July 27, 1984 Mesa filed this action for injunctive relief, declaratory relief, and a writ of mandamus[4] seeking, in part, to enjoin the DOI from collecting royalties demanded by the June 1, 1984 order. By stipulation in this case, the DOI has agreed to stay its order until a final judgment on Mesa's appeal is rendered. In exchange Mesa has filed a letter of credit with the DOI in an amount sufficient to cover any liability for overdue royalties and interest penalties which Mesa might owe.

Follow-up audits of Mesa's account conducted during Mesa's appeal showed that by April 18, 1986 Tennessee had reduced its deficiency to $164,929. Mesa continued to pay royalties as it produced the make-up gas. Accordingly, the DOI's claims for overdue royalties have decreased to $27,488.19. The DOI also claims $1,194,459.53 for interest charges as of June 30, 1986. Mesa has not contested the specific dollar amounts of the DOI's claims. Mesa contends that it does not owe royalties at all until it produces natural gas, including make-up gas.

The Director of the MMS rendered his decision on Mesa's appeal June 27, 1986, affirming the MMS's authority to collect royalties on take-or-pay receipts and impose late charges. On the same day the Assistant Secretary for Land and Minerals Management adopted the decision as the final decision of the Department of the Interior.

## DISCUSSION

This court is called upon to review the DOI's decision affirming its authority to

---

2. Later audits showed Tennessee had actually reduced its deficiency to $5,448,619 as of June 30, 1983.

3. Sixteen and two-thirds percent of $6,011,094 is $1,001,849.

4. See footnote 1, *supra.*

collect royalties on take-or-pay payments. The DOI based its decision on its construction of OCSLA and DOI regulations which govern the terms of offshore mineral leases. In reviewing agency action,

> the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall ... (2) hold unlawful and set aside agency action, findings, and conclusions found to be ... (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

5 U.S.C.A. § 706 (1977).

The Supreme Court recently provided the following additional guidance for reviewing an agency's construction of a statute:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, as always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

In the present case the mineral lease issued by the United States to Mesa requires that Mesa "pay the Lessor a royalty

of 16⅔ percent in amount or value of production saved, removed, or sold from the leased area." This lease provision is authorized by OCSLA, which, at the time the lease was issued, provided in pertinent part:

> An oil and gas lease issued by the Secretary pursuant to this section shall ... (3) require the payment of a royalty of not less than 12½ per centum, in the amount or value of the production saved, removed, or sold from the lease.

43 U.S.C. § 1337(b) (1976) (amended 1978).[5] The statute does not directly address the precise question of whether royalties may be collected on take-or-pay payments; therefore, this court must decide whether the DOI's construction of the statute authorizing such a collection is a permissible one.

Construing the above statute requires a determination of Congressional intent. An examination of the legislative history of the statute reveals that Congress, in drafting the provision, recognized the need to require incorporation of commonly understood commercial terms into the offshore lease provisions:

> An important element of sound leasing policy is fixing the terms of a fair lease. This is a matter for legislative determination and the committee believes it desirable to give consideration to the terms of leases which have been developed and are in general use in the industry after a long period of trial and error.

H.R.Rep. No. 2078, 81st Cong., 2d Sess. 9–10 (1950). *See also Amoco Production Co. v. Andrus*, 527 F.Supp. 790, 794 (E.D. La.1981) (relying on legislative history to determine the meaning of "removed or sold" as found in OCSLA).

■ As commonly understood in the oil and gas industry, "A royalty interest is a right to receive a specified percentage of all oil and gas produced during the lease." *Cox v. United States*, 497 F.2d 348, 350 n.

---

5. The 1978 amendments to OCSLA provide alternate bidding schemes for the leasing of submerged land on the Outer Continental Shelf, but those schemes providing for a royalty payment continue to require payment of a fixed per centum "in amount or value of the production saved, removed, or sold." 43 U.S.C.A. § 1337(a)(1)(A), (B), (C), (F), and (G) (1986).

1354

1, (4th Cir.) *cert. denied* 419 U.S. 1047, 95 S.Ct. 621, 42 L.Ed.2d 641 (1974). Recently, the court in *Piney Woods Country Life School v. Shell Oil Co.*, 539 F.Supp. 957, *modified on other grounds* 726 F.2d 225, *cert. denied* 471 U.S. 1005, 105 S.Ct. 1868, 85 L.Ed.2d 161 (1985), described "royalty" as follows:

> ... the usual and almost universal method for finding oil and bringing it to the surface [is] for the landowner to authorize a person or corporation engaged in such business to find the oil and bring it to the surface, approximating all that he produces thereby to himself except an agreed portion thereof reserved by and to be delivered, or its value paid, to the landowner and usually designated as royalty.

*Id.* at 970–71, *quoting Gulf Refining Co. v. Stanford*, 202 Miss. 602, 30 So.2d 516, 517 (1947). Because a royalty interest is a right to share in production if and when production is obtained, *Union Oil Co. of California v. Touchet*, 229 La. 316, 86 So.2d 50, 53 (1956); *Union Sulphur Co. v. Andrau*, 217 La. 662, 47 So.2d 38, 40–41 (1950); *Frey v. Miller*, 165 So.2d 43, 46, *writ refused* 246 La. 844, 167 So.2d 669 (1964), an owner of a royalty interest is entitled to royalties only to the extent of that production.

"Production" means "those activities which take place after the successful completion of any means for the removal of minerals, including such removal, field operations, transfer of minerals to shore, operation monitoring, maintenance, and workover drilling." 43 U.S.C. § 1331(m) (1986). As was recently recognized by the United States Court of Appeals for the Ninth Circuit, " 'Production,' as used ... in the oil and gas industry, refers to oil and gas actually severed from the ground." *Energy Oils, Inc. v. Montana Power Co.*, 626 F.2d 731, 738 (9th Cir.1980). *See also Union Oil Co. of California v. Touchet*, 229 La. 316, 86 So.2d 50, 53 (1956); *Gulf Oil Corp. v. Reid*, 337 S.W.2d 267 (Tex.1960); *Monsanto Co. v. Tyrrell*, 537 S.W.2d 135 (Tex.Civ.App.1976).

In the present case the royalty interest of the United States entitles it to a royalty of 16⅔ percent of production saved, removed, or sold from the leased area. Accordingly, to the extent there is production from the leased area, the DOI is authorized to collect that royalty. But when Tennessee makes take-or-pay payments it does so *in lieu of* taking production, and the minerals remain in the ground. To the extent Tennessee makes take-or-pay payments, there is no production; therefore, the DOI is not authorized by OCSLA to collect royalties on take-or-pay payments.

Lending additional support for this court's construction are the DOI's own regulations, which clearly indicate that royalties accrue only to the extent actual production occurs. The pertinent regulation provides as follows:

> Royalty is due on all gas which is (a) produced from a reservoir and sold by the lessee; (b) produced from a reservoir and used by the lessee for purposes of production ...; (c) produced from a reservoir but lost....

30 C.F.R. § 206.151 (1986). This regulation plainly comprehends royalties accruing only as natural gas is severed from the ground and sold. Thus, the United States is entitled to royalties as the minerals within the leased area are depleted.

Consistent with § 206.151 are DOI regulations setting forth requirements for the timing of both royalty payments and monthly reports. "Royalty payments are due at the end of the month following the month during which the oil and gas is produced and sold...." 30 C.F.R. § 218.-50(a). Likewise, if the DOI requires a lessee to submit monthly reports "showing ... all transfers of gas and other lease products ... and the royalties accruing therefrom to the lessor ... [, the reports] shall be submitted on or before the last day of the calendar month which follows the calendar month in which the production is obtained." 30 C.F.R. § 210.151 (1986).

These DOI regulations were promulgated by authority of 43 U.S.C. § 1334(a) (1986) to enable the DOI to administer the

provisions of OCSLA. In doing so, the DOI necessarily interpreted Congress's intent behind the statutory requirement that all offshore leases provided for "payment of a royalty of not less than 12½ per centum, in amount or value of the production saved, removed, or sold from the lease." 43 U.S.C. § 1337(b) (1976) (amended 1978). In drafting its regulations, the DOI clearly understood that Congress intended lessees be required to pay royalties only to the extent actual production occurred.

The DOI, in its decision below and in its arguments before this court, contends that royalty is due not on production, but rather on the value of production. The DOI then relies on 30 C.F.R. § 206.150, which defines the "value of production" as follows:

> The value of production shall never be less than the fair market value.... Under no circumstances shall the value of production be less than the gross proceeds accruing to the lessee from the disposition of the produced substances....

The DOI argues that royalties must be paid on the "gross proceeds accruing to the lessee" and that "take-or-pay" payments must be included in "gross proceeds."

■ The DOI errs in its application and narrow interpretation of § 206.150. The lease, OCSLA and DOI regulations, read in their entirety, clearly indicate royalties are due on production. To the extent there has been production, § 206.150 should then be applied to determine the value of that production so that the amount of royalties due may be computed. Section 206.150 itself refers to gross proceeds from the disposition of *produced* substances, indicating that the regulation is applicable only when actual production has occurred. Although the DOI's interpretation of its own regulation is entitled to great deference, *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965), the courts are not bound by an interpretation that is "plainly erroneous or inconsistent with the regulation." *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977). *See also Gill v. Immi-*gration *& Naturalization Service*, 666 F.2d 390, 392 (9th Cir.1982); *Kahlenberg v. Immigration & Naturalization Service*, 763 F.2d 1346, 1349 (11th Cir.1985).

For the foregoing reasons, this court holds that the DOI has no statutory, regulatory, or contractual authority to collect royalties on take-or-pay payments; therefore, the order issued by the DOI to Mesa demanding payment of overdue royalties on take-or-pay payments and imposing late charges is hereby set aside.